# CITY OF SAN ANTONIO ET AL. *v.* SAN ANTONIO PUBLIC SERVICE COMPANY.

APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE WESTERN DISTRICT OF TEXAS.

No. 263. Argued March 23, 1921.—Decided April 11, 1921.

1. The District Court has jurisdiction of a suit by a street railway company to enjoin a city from requiring it to accept an unremunerative rate of fare, and has power to determine whether the right to enforce the rate in question is secured to the city by contract. P. 555.
2. In view of a provision of the Texas constitution (Art. I, § 17), that "no irrevocable or uncontrollable grant of · special privileges or immunities shall be made, but all privileges and franchises granted by the legislature, or created under its authority, shall be subject to the control thereof,"—*held*, that an ordinance of the city of San Antonio which extended the rights, privileges and franchises of certain street railway companies and fixed the rate of fare, should not be construed and could not operate as a contract between them and the city binding them to that rate after it became unremunerative and in effect confiscatory. P. 555.
3. *Held*, also, that even if the city gained power to make such contracts through a later amendment of the state constitution, the existing ordinance was not thereby converted, for the future, into a contract. P. 555.
4. A maximum fare limitation in a street railway franchise, granted by a city which was vested with the rate regulating power and forbidden to restrict it by contract, should be taken as in exercise of the regulating power and not as imposing a unilateral contract or condition upon the grantee to observe the limitation even though it become confiscatory, and especially so where the case exhibits no actual intention of the parties to bind the grantee and not the city. P. 556.
5. Where a city consented to a consolidation of a gas and electric with a street railway corporation, upon condition that their existing obligations should be preserved, and where the obligation of the street railway to collect no more than a fare fixed by ordinance arose under and had long been attributed in practice to the city's regulating

power, and that power was expressly reserved as to gas and electricity in the ordinance permitting the consolidation, *held*, that a contract binding the consolidated company to the fare limitation after it became confiscatory could not be implied. P. 556.
Affirmed.

THIS was a suit by the appellee to enjoin the appellants from enforcing an ordinance limiting the fare chargeable on its street car lines to an amount which had ceased to yield adequate returns and had become confiscatory. The court below overruled a motion to dismiss the bill (257 Fed. Rep. 467), and, on final hearing, granted the relief prayed. The facts are given in the opinion.

*Mr. R. J. McMillan,* with whom *Mr. Claude V. Birkhead* was on the briefs, for appellants.

*Mr. S. J. Brooks,* with whom *Mr. Howard Templeton* and *Mr. Walter P. Napier* were on the brief, for appellee.

MR. CHIEF JUSTICE WHITE delivered the opinion of the court.

The decree below enjoined the City of San Antonio from enforcing a five cents fare against the Public Service Company, operating street railway lines in that city, on the ground that the right to enforce such rate was not secured to the city by contract and such enforcement was beyond the power of the city because of the confiscation of the property of the railway company which would result, in violation of the Fourteenth Amendment to the Constitution of the United States.

The consideration we must give the subject will be clarified by outlining the origin and development of the controversy.

In March, 1899, the City of San Antonio by ordinance extended to July 1, 1940, "the rights, privileges and franchises heretofore granted to and existing in the San

Antonio Gas Company, Mutual Electric Light Company, San Antonio Street Railway Company and the San Antonio Edison Company." The ordinance provided, among other things, that the two companies last named, which operated street railways in the city, "shall charge five cents fare for one continuous ride over any one of their lines, with one transfer to or from either line to the other."

In April, 1900, all the property of the two railway companies was sold under a decree of a state court to the San Antonio Traction Company, and that company, with the approval of the city, thereafter controlled and carried on both lines.

In 1903 the State enacted a half-fare law, making it the duty of the Traction Company to carry school children and students for half fare, and subsequently an ordinance was passed by the city in furtherance of this law. The company refusing to carry out this legislation on the ground that it impaired the obligation of its contract as to rate of fare resulting from the ordinance of 1899, in violation of the constitutions of the State and of the United States, a suit by mandamus to compel it to do so was begun by an individual, and, from a ruling adverse to the company's contention, the case was taken to the Court of Civil Appeals. That court held that it was unnecessary to consider whether the rate requirement was a contract because, as it was adopted long after the provision of the state constitution, that "no irrevocable or uncontrollable grant of special privileges or immunities shall be made, but all privileges and franchises granted by the legislature, or created under its authority, shall be subject to the control thereof," it was necessarily to that extent restricted, and therefore left the State free, within the limits of the restriction, to exert the authority to regulate. As a result, the half-fare law was upheld, obviously upon the conclusion that it was within the power

to regulate as restricted by the constitutional provision (Tex. Civ. App., 81 S. W. Rep. 106).

Because of the federal question the case was brought to this court, and the decree was affirmed substantially on the ground which had controlled the decision below. In addition, however, the court was careful to point out that the state constitution prohibited a rate regulation which was confiscatory, but that in view of the absence of all averment that the rate in question was confiscatory, it was unnecessary to deal with that subject. *San Antonio Traction Co.* v. *Altgelt,* 200 U. S. 304.

Presumably under the power to regulate as thus established, the city thereafter passed, and the Traction Company carried out, an ordinance imposing the duty of free transportation of policemen and firemen.

In 1912 the state constitution was amended so as to authorize cities having more than 5,000 inhabitants, by vote of their electors, to amend their charters or adopt new ones, subject to the limitation that the charters should not contain any provision inconsistent with the constitution or general laws of the State.

In the meantime the two companies, gas and electric, dealt with in the ordinance of 1899, were consolidated and became the San Antonio Gas and Electric Company, and in 1917 the appellee, the San Antonio Public Service Company, petitioned the city government to consent to its acquisition of all the rights and property of the San Antonio Traction Company and of the San Antonio Gas and Electric Company, thus proposing to bring under one control the four corporations dealt with in the ordinance of 1899. The city consented by an ordinance which expressly subjected the Public Service Company to all the limitations, duties and obligations which rested upon the Traction Company and the Gas and Electric Company. The ordinance further provided that:

"In accepting the provisions of this ordinance the

San Antonio Public Service Company agrees that the City shall hereafter have the right to pass all ordinances not in direct conflict with the laws of this State fixing and regulating the rates, prices and terms at which gas and electricity shall be furnished for public and private purposes to the City and its inhabitants."

This was followed by provisions requiring the keeping of such accounts by the Public Service Company in its gas and electric departments as would enable the city to exercise the power to fix rates as to gas and electricity. The ordinance having been accepted by the Public Service Company, the consolidation was accomplished.

At and for a long time prior to the consolidation the penal code of the city contained a provision, accompanied by a penalty for its violation, forbidding, except during certain hours of the night, the charging of more than a five cents fare within the city limits. Shortly after the approval of the consolidation, another ordinance was passed forbidding and penalizing any person, firm or corporation, enjoying franchises within the city limits, or their agents or employees, from charging more than the rate then charged and collected, without obtaining the permission of the city. In conformity with this last mentioned ordinance, the Public Service Company, in August, 1918, applied to the city for permission to increase its rate of fare from five to six cents, based upon the ground that, although the five cents fare was remunerative at the time it was fixed, it had, by the increase in cost of operation in practically every department, become wholly insufficient for that purpose and could not be continued without confiscating the property of the company. After a hearing, the city, by an ordinance reciting that, as the company was bound by the forty-year franchise granted in 1899 to charge five cents fare, the city did not feel authorized nor called upon to set it aside, and furthermore that the hearing had shown no necessity for

the change in rate asked, refused the company's request, at the same time prohibiting, under a penalty which was stated, any person, firm, or corporation operating any street railway within or partly within the city from charging more than a five cents fare.

Thereupon the company commenced this suit by filing its bill to enjoin the city from enforcing the five cents fare ordinance. The bill, after alleging the adequacy of the rate of five cents when originally fixed in 1899, contained the amplest averments concerning its present confiscatory character. The prayer was for a temporary injunction restraining the enforcement of the five cents fare ordinances and from interfering with the company in putting in a seven cents fare instead, and from enforcing the ordinances which forbade a change of fare. It was prayed that, if the company was not permitted to put in effect the seven cents fare, the court would itself establish that rate, or such other as it might find necessary to enable the company to pay its operating expenses and to earn a reasonable sum on its investment, and that a permanent injunction securing the results prayed be awarded.

The city moved to dismiss the bill for want of jurisdiction because it presented no substantial federal question, as it showed on its face that the parties were bound by the five cents fare provision of the franchise ordinance as a contract subject to be enforced even though the rate was confiscatory, and moreover because the bill otherwise stated no ground for equitable relief. The court overruled the motion. It reviewed the history of the case and decided that, in view of the controversy as to contract growing out of the enforcement of the half-fare law terminated by the ruling of this court in the *Altgelt Case*, as well as of all the subsequent dealings between the parties, the existence of a contract as to the five cents fare was not established, and hence, the attempt to enforce it, because of the confiscation to result, gave a cause of

action under the Constitution of the United States. 257 Fed. Rep. 467.

The city then answered reiterating the grounds of its previous challenge to the jurisdiction and asserting that the franchise ordinance rate was based upon a contract resulting from that ordinance and from the action taken at the time and in furtherance of the consolidation. It further asserted an estoppel to deny the contract, arising from various acts of the city and the corporation or its predecessors from the time of the ordinance in 1899 to the bringing of the suit in 1918. Moreover, disputing the confiscatory character of the five cents fare, it claimed the right to compel its continued exaction in virtue of its general governmental authority to regulate the fares of street railway companies.

The case was referred to a master to report on the facts and the law. Before the master, a hearing was had, followed by an elaborate report on both subjects. As the action of the court overruling the exception to its jurisdiction had adversely disposed of the question of the existence of the contract concerning the five cents fare, the master put that subject out of view and therefore reported only on the facts as to the confiscatory character of the five cents rate and of the power of the court, under the assumption that it was confiscatory, to restrain its enforcement.

A few words from the report will suffice to make manifest the conclusion of the master. He said: "The rate prescribed by the ordinance is insufficient, because of the changed conditions since the rate was fixed twenty years ago, to enable the company to earn a fair return; but I have reached the conclusion that to admit the contention of the company would be for the court to exercise a power it does not possess; . . . A rate, reasonable when fixed, does not become unreasonable, from the judicial point of view, because of changed conditions."

Although the Public Service Company excepted to the conclusion of law thus stated and to some of the separate conclusions of fact made by the master, no exception whatever to the report was made by the city, and the case therefore went to the court upon the admitted confiscatory character of the rate, upon the question of contract, and upon the power of the court, if no such contract existed, to restrain the confiscation which would result from giving effect to the rate. Adhering to its previous ruling, the court declared that it had jurisdiction to prevent the admitted confiscation which would result from the five cents rate. Concluding, however, that, as the court was not a primary rate-making authority, it would not fix a reasonable rate to replace the five cents rate, the enforcement of which would be enjoined, and expressing the hope that the parties might agree upon such a rate, it announced that it would postpone shaping the final decree for that purpose.

Some weeks afterward the final decree was entered. It enjoined the city from interfering with the complainant in substituting a seven cents fare for the five cents fare and besides enjoined the city from enforcing the various ordinances complained of in the bill prohibiting and punishing the charging of a higher rate than five cents. The decree reserved, however, the right to the city to ask relief whenever because of a change in conditions the five cents fare should cease to be confiscatory. In addition, the enforcement of the city ordinance imposing the half-fare rate for school children was enjoined, although the continued enforcement of the state half-fare law, which had been upheld in the *Aligelt Case*, was expressly declared not to be restrained. On the direct appeal of the city because of the constitutional question involved, we are called upon, as at the outset stated, to determine whether error was committed in the decree thus rendered.

·That in view of the admitted fact of confiscation the court had power to deal with the subject, we are of opinion ·is too .clear for anything but statement. And we think it is equally clear that, as the right to regulate gave no power whatever to violate the Constitution by enforcing a confiscatory rate, a result which could · only be sustained as a consequence of the duty to pay such rate arising from the obligations of a contract, it follows that the solitary question to be considered is whether a contract existed empowering the city to enforce the confiscatory rate.

Primarily the answer to that question must depend upon whether the ordinance of 1899 fixing the five cents rate was a contract. That it was not and could not be, we are of opinion is the necessary result of the provision of § 17, Article I, of the state constitution, existing in 1899, prohibiting any "irrevocable or uncontrollable grant of special privileges," etc., when considered in the light of the irrevocable and uncontrollable elements which must necessarily inhere in the ordinance of 1899 to give it the contract consequence relied upon. Indeed, this result is persuasively established by the ruling in the *Altgelt Case*, to the effect that if the contract right were conceded there would, in view of the constitutional restriction, be such an inevitable conflict between that right and the dominant power to regulate as to render the contract right inoperative, and therefore to cause it to perish from the mere fact of admitting its conflict with the authority to regulate.

But it is urged that, as by the amendment to the state constitution of 1912 the city was endowed with authority broad enough to enable it to contract, in granting a street railway franchise, concerning the rate of fare to be charged, disenthralled from the limitation of § 17, Article I, of the state constitution, it follows that the franchise ordinance must after that date be viewed as such a contract and treated accordingly. But as no contract between the

city and the Traction Company made after the consti-
tutional amendment in 1912 concerning the fare in ques-
tion is referred to, it is plain that, even if the proposition
as to power of the city after 1912 be, for the sake of the
argument, conceded, it is irrelevant to the case we are
considering.

And this is true also of the suggestion made in argument,
that although no contract was possible under the consti-
tutional restriction which would bind the city not to lower
the rate, nevertheless there was a unilateral contract or
condition resulting from the granting of the franchise
which bound the railway company to the franchise rate,
since again there is not the slightest suggestion of any
attempt on the part of the parties consciously to produce
such a condition. But besides, the error underlying the
proposition is not far to seek. The duty of an owner of
private property used for the public service to charge only
a reasonable rate and thus respect the authority of gov-
ernment to regulate in the public interest, and of govern-
ment to regulate by fixing such a reasonable rate as will
safeguard the rights of private ownership, are interde-
pendent and reciprocal. Where, however, the right to
contract exists and the parties, the public on the one hand
and the private on the other, do so contract, the law of the
contract governs both the duty of the private owner and
the governmental power to regulate. Were, therefore, as
in the case supposed in the argument, the regulating
power of government wholly uncontrolled by contract,
it would follow that that power would be required to be
exerted and hence the supposed condition operating upon
the private owner would be nugatory. Such a case really
presents no question of a condition, since it resolves itself
into a mere issue of the exercise by government of its
regulatory power.

Further, however, it is urged that, as at the time of
the consolidation in 1917 the powers of the city were not

limited by the constitutional provision referred to, the
necessary effect of the obligations which the Public Serv-
ice Company came under was to convert the five cents
fare ordinance into a contract conferring the right to en-
force it even though confiscatory. But that question
rests upon mere implications, as no express provision to
that effect is pointed out. Moreover, its entire want of
merit not only results from that fact but from the un-
warranted character of the implications upon which it is
based. They proceed upon assumptions that, because the
city exacted as a condition for consenting to the con-
solidation, that the existing obligations and duties of the
corporations should be preserved, a contract as to the
five cents fare arose. The error of the proposition in all
its aspects is equally apparent from a broader view, since
from the date of the final decision in the *Altgelt Case* up
to the time when the contention as to confiscation result-
ing from the changed conditions arose, the acts and deal-
ings of the parties unmistakably indicated the purpose to
exert the authority derived from the power to regulate,
to the exclusion of the limitations resulting from the right
of contract which had been unsuccessfully asserted by
the Traction Company in the *Altgelt* litigation. This
deduction arises not only from the exertion by the city,
after the finality of the *Altgelt* litigation, of the power to
compel the carrying of policemen and firemen without
charge, but also from the general limitations expressed
in ordinances making no reference whatever to contract
rights, and asserting the right of the city to give or not
to give consent to a change of rate.

In fact, the city ordinance expressing the consent to
the consolidation makes this clear, since, having in the
second section imposed upon the Public Service Company
"all the limitations, duties, contracts, forfeitures and
obligations imposed on or required of either of said com-
panies at this time," yet expressly, in the third section, it

stipulated for the right of the city to regulate the charges for the gas and electric services, and imposed upon the Public Service Company the duty of keeping the accounts as to such services in such a manner as to enable this to be done. Light is necessarily thrown on the purpose of this provision by considering that the right of the Public Service Company to assert that the maximum rates fixed by the ordinance of 1899 in favor of the gas and electric companies were contracts limiting the power of the city to regulate, had not been determined adversely to those companies, as had been done as to the Traction Company by the *Altgelt Case,*—a view the force of which will be felt by recalling that, by the amendment to the city's charter which we have stated, the constitutional limitation which led to the deflection of the contract clause in the *Altgelt Case* was no longer applicable.

The bold contrast between the ordinance referred to and the statement made by the city in the ordinance refusing the increase in rate to meet the confiscation, because of the assumed restraint put by an existing contract, tends to throw abundant light on the situation. The fact is, that all the contentions of the city as to implication of contract as to the 1899 rates but illustrate the plainly erroneous theory upon which the entire argument for the city proceeds, that is, that limitations by contract upon the power of government to regulate the rates to be charged by a public service corporation are to be implied for the purpose of sustaining the confiscation of private property. *Home Telephone Co.* v. *Los Angeles*, 211 U. S. 265, 273, and cases cited; *Milwaukee Electric Railway & Light Co.* v. *Wisconsin R. R. Commission*, 238 U. S. 174, 180.

*Affirmed.*