## CITY OF LOUISVILLE v. LOUISVILLE RY. CO.

(Circuit Court of Appeals, Sixth Circuit. May 4, 1922. On Petition for Rehearing, July 14, 1922.)

No. 3553.

1. **Statutes ⬥⬥238—Nothing passes by implication in grant of franchise.**

Only that which is granted in clear and explicit terms passes by grant of property, franchises, or privileges in which the government or the public has an interest; nothing passes by implication.

2. **Carriers ⬥⬥12(9)—Act extending street railway charter held not to extend rate contracts with city.**

Acts Ky. March 3, and April 9, 1886 (Loc. & Priv. Acts 1885–86, cc. 141, 569), extending the charters of Louisville street railway companies for a term of 99 years, with authority to maintain and operate street car lines on routes granted in the charter or by the city council, and authorizing the council to grant the companies the authority to build and operate such lines and routes on such terms as might be agreed on between the company and the general council, did not extend existing contracts between the city and the companies establishing a five-cent fare for the full period of the extended charter.

3. **Carriers ⬥⬥12(9)—Statute extending street railway charter not construed to surrender rate control for long period, unless fairly stating so.**

A statute extending the charter of a street car company for 99 years should not be construed as absolutely surrendering the power of rate control for that period, unless such intention is stated in terms which leave no room for implication; the question of intent being governed by the same test, whether the company or the city is asserting the contract.

4. **Carriers ⬥⬥12(9)—Acceptance of extension of corporate charter does not bind company to rate contract, unless so intended.**

Where a contract with a city, which fixed street car fares, had become ingrafted on the charter given the company by the Legislature, the acceptance by the company of the extension of its charter and right to occupy the streets of the city would not bind the company to comply with the rate contract after its expiration, unless such was the intention of the Legislature.

5. **Carriers ⬥⬥12(9)—Extension of contract with city, which permitted operation after expiration of term, held not to extend fare contract.**

Where a contract between a city and a street railroad company fixed the fare at five cents, and gave the company the right to continue permanently to operate after the expiration of the contract until the city elected to purchase the lines, the extension of the company's charter and its right to occupy the streets by act of the Legislature did not require the company to operate at the contract rate after the expiration of the original contract, and before the city exercised its option to purchase the lines.

6. **Carriers ⬥⬥12(9)—Statute amending charter, subject to subsequent amendment, does not ratify fare contract.**

Act Ky. April 5, 1878 (Loc. & Priv. Acts 1877–78, c. 772), amending a street railway company's charter, by authorizing the company to make contracts with the city, changing or extending the contracts then in force, even if it be construed as a ratification of an existing contract fixing the rate of fare at five cents, did not make that contract irrevocable, in view of the further provision of the act expressly declaring the rights and franchises to be subject to amendment by the General Assembly, and subject to regulation by the city council.

7. **Carriers ⬥⬥12(9)—Intention to create perpetual five-cent fare, unless city purchased property, will not be found, unless unmistakably expressed.**

A contract between a city and a street railroad company, giving the company the right to operate on the streets for a term of 30 years, with

⬥⬥For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
281 F.—23

the privilege of continuing to operate after expiration of the term until the city chose to purchase the lines of the company, will not be construed as intended to make perpetual the five-cent fare fixed by the original contract, subject only. to the right of the city to purchase the lines, unless such intention is clearly expressed.

8. **Street railroads** ⬅️13—Municipal purchase provision in franchise held valid.

The mere fact that a provision in a street railway franchise giving the city power to purchase extended a reasonable period beyond the company's then chartered life was not enough to destroy the provision.

9. **Carriers** ⬅️12(9)—In absence of contract, company is not bound by confiscatory rate.

In the absence of a binding contract fixing street car fares, the company is not bound to continue to operate at a rate of fare which is in fact confiscatory, but has a right to invoke relief against the continued enforcement of such a rate.

On Petition for Rehearing.

10. **Appeal and error** ⬅️1199—Affirmance of temporary injunction held not to prevent District Court from modifying injunction.

Though a District Court's temporary injunction restraining a city from interfering with the charging of a seven-cent fare by a street railway was affirmed by the Circuit Court of Appeals, in view of the scope of the opinion, *held*, that the District Court had authority to modify the injunction, if it so desired.

Appeal from the District Court of the United States for the Western District of Kentucky; Walter Evans, Judge.

Suit in equity by the Louisville Railway Company against the City of Louisville to enjoin the enforcement of a five-cent fare. From an order granting a temporary injunction, defendant appeals. , Affirmed.

Joseph S. Lawton, City Atty., and Wm. T. Baskett, both of Louisville, Ky. (Davis W. Edwards and M. H. Thatcher, both of Louisville, Ky., on the brief), for appellant.

Churchill Humphrey, of Louisville, Ky. (Howard B. Lee, and Humphrey, Crawford & Middleton, all of Louisville, Ky., on the brief), for appellee.

William W. Watts, of Louisville, Ky., amicus curiæ.

Before KNAPPEN, DENISON, and DONAHUE, Circuit Judges.

PER CURIAM. The Louisville Railway Company has for many years owned and operated the street railway system in Louisville under a five-cent fare. On January 27, 1921, it filed in the District Court below a bill in equity alleging that a five-cent fare was confiscatory, within the meaning of the Fourteenth amendment to the federal Constitution, and asking injunction against the enforcement of that rate and against interference with the maintaining of a seven-cent fare, which the city had refused to authorize. This appeal is from the issue of a temporary injunction to that effect.

The meritorious question is whether, as the city contends, the company is limited by enforceable contract to a five-cent fare, or whether, as contended by the company, .there is no such existing rate contract. The controversy grows out of this situation.

The Louisville Railway Company was incorporated by act of the

⬅️For other cases see same topic & KEY-NUMBER in all Key-Numbered.Digests & Indexes

General Assembly of Kentucky, January 22, 1867 (Loc. & Priv. Acts 1867, c. 1068), for a term of 30 years. The act of incorporation contained no rate provision. The company, however, operates principally under, and as purchaser and owner of, the franchises of four other railway companies, each chartered by the General Assembly, viz.: The Louisville City Railway Company, chartered February 15, 1864 (Loc. & Priv. Acts 1863–64, c. 342); the Central Passenger Railroad Company, chartered December 29, 1865 (Loc. & Priv. Acts 1865–66, c. 60); the Citizens' Passenger Railway Company, chartered January 22, 1866 (Loc. & Priv. Acts 1865–66, c. 177); and the Kentucky Street Railway Company, chartered April 19, 1882 (Loc. & Priv. Acts 1881–82, c. 1125). The term of the existence of each of these companies (except the Kentucky Street Railway Company) was fixed in the charter at 30 years.[1] The charter of the Louisville City Company provided that the rate of fare for any distance within the city limits should not exceed five cents, but the charter was in 1867 so amended as to allow the Company to charge whatever rate of fare might be allowed by the general council of the city.

The charter of the Central Passenger Railroad Company also provided that "the rate of speed, frequency of the trips and price of fare shall be regulated by said general council of Louisville." In the case of each of the three companies (other than the Kentucky Street Railway Company) the charter authorized the corporation to construct, maintain, and operate "as the general council of said City may authorize said corporation so to do, in such manner, and upon such terms and conditions, and with such rights and privileges as the general council may by contract or otherwise, with said corporation * * * prescribe." The contract of each of these three companies with the city provided that it should not "charge a greater fare than five cents" for each passenger for any distance within the limits of the city, and gave the city an election of purchase, declaring that the right of the railway company "hereby vested in them to operate said railways" should extend to the "full time of 30 years" from the date of the contract, and, in substance, that upon the expiration of the 30-year period the company should be entitled to enjoy "all the said privileges" on the conditions and subject to the terms and restrictions expressed in the contract, until the city should duly elect to purchase the railway and should pay for the same.[2]

The Citizens' Passenger Company deeded all its property and franchises to the Louisville City Railway Company June 1, 1872, and on June 19, 1890, the Louisville City, the Central Passenger, and the

[1] Previous to the granting of these charters, the General Assembly had authorized the city generally to pass ordinances for the construction of street railways, one giving authority by ordinance to "prescribe the fare, which shall in no case be higher than ten cents"; another authorizing the general council "by contract, sale or bargain" to empower corporations or others "to construct street railroads," the general council reserving all rights to regulate and control the same.

[2] In the case of the Kentucky Street Railway Company, neither the state charter nor the city ordinance contained a five-cent fare limitation. As stated in the city's brief, its lines are negligible.

Kentucky Companies each deeded all its property and franchises to the Louisville Railway Company, which thus became possessed of the rights of all four of the original companies. On March 3, 1886, and April 9, 1886, respectively, the charters of the Central Passenger Railroad Company and the Louisville City Railway Company were, by act of the General Assembly, extended for a term of 99 years from the date of the respective amendatory acts.[8]

On February 14, 1856 (Pub. Acts 1855–56, c. 148) the General Assembly of Kentucky declared by statute that "all charters and grants of or to corporations, or amendments thereof, and all other statutes, shall be subject to amendment or repeal at the will of the Legislature, unless a contrary intent be therein plainly expressed," with a proviso that no amendment or repeal should "impair other rights previously vested." This statute has never been repealed. The rate-making power was vested in the General Assembly, except as specially delegated thereby to the municipality. Winchester v. Winchester Waterworks, 251 U. S. 192, 40 Sup. Ct. 123, 64 L. Ed. 221.

Previous to the adoption of the Constitution of 1891, street railways were incorporated only by special or local enactment of the General Assembly. By section 59 of the Constitution of 1891 the General Assembly was forbidden to pass local or special acts for the incorporation of such companies. By section 163 street railway companies were forbidden to construct their tracks upon the public streets of a city without first obtaining the consent of the proper legislative board of the city. By section 164 cities were forbidden to grant franchises for a term exceeding 20 years, and were required, before granting the same, to receive public bids therefor after due advertisement, and to award the same to the highest and best bidder. By section 3 it was declared that every grant of a franchise, privilege, or exemption shall remain subject to revocation, alteration, and amendment, and by section 190, that no corporation then in existence should have the benefit of future legislation without first filing in the office of the secretary of state an acceptance of the provisions of that Constitution.

In 1904 the Louisville Railway Company, which then owned all the property and franchises of the Louisville City, the Central Passenger, Citizens' Passenger, and Kentucky Railway Companies, duly filed its acceptance of the provisions of the Constitution of 1891.

The company contends, first, that no valid and enforceable rate contracts were effected by the charters of the respective railway companies and the amendments thereto, and the ordinances and contracts made between said companies and the city, for the reason, among others, that such contracts were beyond the powers of the city, and whether or not they are affected by the act of 1856, which act, however, the company contends of itself prevented a suspension by contract of the rate-making power;[4] second, that, even if such asserted rate contracts

---

[8] The charter of the citizens' Passenger Railway Company does not seem to have been similarly extended, and presumably because it had nearly 14 years previously conveyed its property and franchises to the Louisville City Railway Company.

[4] Invoking Covington v. Kentucky, 173 U. S. 231, 19 Sup. Ct. 383, 43 L. Ed. 679, and the San Antonio Case, 255 U. S. 547, 41 Sup. Ct. 428, 65 L. Ed. 777.

were originally valid and enforceable, all expired by their terms many years ago, their life not having been protracted by the extension act of 1886 (Loc. & Priv. Acts 1885–86, c. 141); and, third, that, even if such contracts were originally valid and enforceable, and even if validly extended under the act of 1886, they were abrogated by virtue of the Constitution of 1891 and its acceptance by the railway company, through the reservation to the state of the rate-making power.

The city contends, on the other hand, first, that the Legislature delegated to the city beyond recall the power to make the contracts in question,[5] and that thereby a vested right was created in the city within the proviso of the act of 1856; that the original contracts thus remain binding until the Legislature shall intervene, which it has not done; second, that the 99-year charter extensions under the act of 1886 extended the then existing rate contracts between the city and the various companies in question, effectually binding the latter thereby, and estopping them from questioning the fairness of the then existing rates; and, third, that by accepting the new Constitution the companies did not and could not relieve themselves of their existing obligations, and that the same remain binding and enforceable until the Legislature should take steps to fix rates, either directly or by delegating authority to some board or agency.

After the cause was submitted here, we certified to the Supreme Court the questions of the effect of the act of 1856, of the extensions under the act of 1886, and of the acceptance of the Constitution of 1891; the proceeding was dismissed as not within section 239 of the Judicial Code (Comp. St. § 1216). 257 U. S. 619, 42 Sup. Ct. 169, 66 L. Ed. ——. The case has since been reargued before us. After mature consideration we are of opinion that, whatever may have been the effect of the original rate contracts with the city, either alone or as affected by the statute of 1856, or of the acceptance by the company of the Constitution of 1891, such rate contracts were not extended by the act of 1886, and so had expired before the present controversy arose.[6] In other words, assuming for the purposes of this opinion (but not so deciding) that the 30-year rate contracts were originally valid and enforceable as such, that the act of 1856 had only the effect claimed by the city, and that by virtue of the acceptance in 1904 by the plaintiff Louisville Railway Company of the Constitution of 1891 that company was not relieved of such obligations as it was then under, yet that before and at the time of such acceptance the rate contracts had terminated because not irrevocably extended by the act of 1886.

First, considering the subject without reference to the provision for municipal purchase before referred to: We copy section 1 of the ex-

[5] Invoking the Detroit Case, 184 U. S. 368, 22 Sup. Ct. 410, 46 L. Ed. 592, and 242 U. S. 238, 37 Sup. Ct. 87, 61 L. Ed. 268, the Cleveland Case, 194 U. S. 517, 24 Sup. Ct. 756, 48 L. Ed. 1102, and the Columbus Case, 249 U. S. 399, 39 Sup. Ct. 349, 63 L. Ed. 669, 6 A. L. R. 1648.

[6] The 30-year contract terms of the Louisville City, Central Passenger, and Citizens' Passenger Companies expired in 1897, 1898, and 1899, respectively. The contract of the Kentucky Street Railway Company had not expired, but, as already said, it had no five-cent fare restriction, and, as the city properly states, its lines were negligible.

tension act in full in the margin dividing it for convenient reference into three paragraphs.[7] Manifestly, the first paragraph extends for 99 years the corporate life of the company—the franchise "to be." Equally clearly the second paragraph extends for the same period the Company's right to build, maintain, and operate street railways in Louisville—the franchise "to do."

[1] The controlling question is—was it or was it not the intention of the Legislature to extend the rate contract for the same period of 99 years, and thus absolutely surrender during that period the right of rate control? This question must be answered in the light of the well-settled rule of intention, that only that which is granted in clear and explicit terms passes by a grant of property, franchises, or privileges in which the government or the public has an interest. Nothing passes by implication. Knoxville Water Co. v. Knoxville, 200 U. S. 22, 34, 26 Sup. Ct. 224, 50 L. Ed. 353; Blair v. Chicago, 201 U. S. 400, 471, 26 Sup. Ct. 427, 50 L. Ed. 801; Cleveland Electric Ry. Co. v. Cleveland, 204 U. S. 116, 129, 27 Sup. Ct. 202, 51 L. Ed. 399; Rochester Ry. v. City of Rochester, 205 U. S. 236, 27 Sup. Ct. 469, 51 L. Ed. 784; Central Trust Co. v. Municipal Traction Co. (C. C.) 169 Fed. 308, 311 et seq.

[2, 3] Considering the second paragraph in connection with the third, it is seen that nowhere is the subject of rates or fares mentioned. There is language which suggests, we think rather faintly, the idea of an extension of existing rate contracts; but to our minds it is merely a suggestion. The language employed seems equally consistent with an intention to reserve the power of rate control for future action. It is, at the most, only by implication that the intention to continue existing rate control can be found, and, as we have seen, that is not enough. Moreover, an intention to make absolute surrender of rate control for a period of three generations of men is so much out of the ordinary that it should not, in our opinion, be found unless stated in terms which leave no room for implication; for it scarcely need be said that the question of intent must here be governed by the same test as if the company, rather than the city, were asserting a 99-year rate contract.

[4] We do not overlook the contention that the rate contract with the city had become ingrafted upon the charter given by the Legislature, and the power of the latter to extend the rate contract in connection with an extension of the charter may be conceded. But, unless such was the legislative intent, the acceptance by the company of the

---

[7] "Section 1. That the charter of the Central Passenger Railroad Company as amended," etc., "and the same is hereby further amended, so as to extend the said charter for the period of ninety-nine years from and after the passage of this act,

"With power and authority to build, maintain and operate street car lines on the streets, and lines, and routes granted in said charter, or by ordinance or resolution of the general council of said city, to be operated by any motive power now authorized in said charter as amended, and with or without conductors on its cars, as it deems best.

"That hereafter said council may, by ordinance or resolution, grant said company the right and authority to build and operate such lines and routes and on such terms and conditions as may be agreed on between said company and said general council."

extension of its charter and right to occupy the streets of the city would not bind the company to comply with an expired rate contract. The question remains one of intention. The case of Louisville v. Cumberland Telephone Co., 224 U. S. 649, 32 Sup. Ct. 572, 56 L. Ed. 934, is not a close reference, as that case involved no question of rates.

[5] Turning to the effect of the extension of the right to operate until the city should elect to purchase the railway properties, as provided in the city's contracts with the Central Passenger Railroad Company, Louisville City Railway Company, and the incorporators of the Citizens' Passenger Railway Company. The second paragraph of the contract between the city and the Central Passenger Railroad Company is as follows:

"Second. The right of said Central Passenger Railroad Company hereby vested in them to operate said railways shall extend to the full time of 30 years from and next after the date of these articles of agreement; and at the expiration of said time, the said Central Passenger Railroad Company, operating said railways, shall be entitled to enjoy all the said privileges on the conditions and subject to the terms and restrictions herein expressed, until the city of Louisville shall elect, by ordinance or resolution for that purpose, to purchase said track or railways, and the cars, carriages, station grounds, depot grounds, furniture and implements of every kind and description used in the construction and operation of said railway or railways, and any of the appurtenances in and about the same, and pay for the same in the manner hereinafter mentioned."

The third paragraph provides that the ordinance or resolution referred to in the second paragraph shall fix the time when the city will take the railways and other properties mentioned, "which shall not be less than six months after the passage of such ordinance or resolution," and provides that at the time of taking such railways and property, "if the city shall so elect as before mentioned," it shall pay to the railway company therefor a sum to be ascertained and determined by three commissioners to be appointed for the purpose in the manner provided by the contract.[8] For more than one reason it would seem that the extension of the right to operate during the period, if any, which should elapse between the termination of the 30-year charter term and the time when, if ever, the city should elect to buy the railway properties, did not create a five-cent fare contract still binding upon the railway company when this suit was instituted.

The language of the provision in question is in form permissive only, and not obligatory:

"The railway company operating said railways shall *be entitled to enjoy* all the said privileges," etc.

This provision was manifestly designed for the benefit of the railway company, which did not agree to continue to operate indefinitely under the contract rate after the end of its then corporate term. The city has never elected to buy the railway properties, and was never

---

[8] The language of the provisions in the three contracts is the same, except that in paragraph 2 of the Louisville City Railway Company's contract the words "and subject to the terms and restrictions herein," preceding the word "expressed," are omitted; also in paragraph 3 the word "as," preceding "before mentioned." All three contracts have doubtless the same meaning.

bound to do so. In view of what later occurred, it is not important to consider what would have been the effect of the words "on the conditions and subject to the terms and restrictions herein expressed" upon an operation had after the expiration of the 30-year period and under the favor of the "shall be entitled" clause. Such situation never occurred. Eight years before the expiration of the charter period the act of 1886 took effect, extending the company's charter and its right to build, maintain and operate for a period of 99 years thereafter.

[6] It is true that on April 5, 1878 (Loc. & Priv. Acts 1877–78, c. 772) the Legislature had amended the company's charter by authorizing it to make contracts with the city, "changing or extending the contracts now in force as may be agreed upon with said city," and further to "continue to hold and exercise its rights and franchises granted and conferred by the act to which this [is] an amendment," etc. But even if it be assumed that a ratification of the five-cent fare contract was effected by the general language so employed, yet these "rights and franchises" were by the act in question expressly declared to be "subject to alteration, repeal and amendment by the General Assembly of this commonwealth, and subject to the rules and regulations which have been or may be lawfully prescribed by the general council of the city of Louisville." The acts of 1878 and 1886, taken together, do not seem to indicate recognition of an indefinite extension of the company's five-cent fare contract beyond the original 30-year contract period.

If the municipal purchase provision is to be construed as giving the city an election to buy, to be exercised only within a reasonable time after the end of the 30-year charter period, obviously the effect of the provision for a five-cent fare, pending such election, has long since expired. When the present controversy arose about 24 years had passed since the expiration of the original charter period. It is only upon the theory that such right of election was perpetual that there exists any room for contending that by its nonexercise the five-cent fare contract is still alive.

[7] Under the rule that a grant of franchises and privileges in which the public has an interest carries nothing not granted in clear and explicit terms, an intention to create a perpetual five-cent fare (capable of being defeated only by a perhaps undesirable municipal purchase) should not be found unless clearly and unmistakably expressed. Here again the question of intention is no different than if the company, rather than the city, were claiming a perpetual rate contract. The status and conditions existing when the contract was made must govern. Yet "rate of fare" is nowhere mentioned in the municipal purchase provision of the contract. It is covered, if at all, only by the words:

"All the said privileges [the rate of fare was first mentioned in the subsequent paragraph 6] on the conditions and subject to the restrictions herein expressed."

[8] There remains the inherent improbability that in 1864 and 1866 the city would have intended to make a perpetual five-cent fare contract. While the mere fact that the municipal purchase provision ex-

tended a reasonable period beyond the company's then chartered life was not enough to destroy it (Detroit v. Detroit Citizens Ry. Co., 184 U. S. 368, 22 Sup. Ct. 410, 46 L. Ed. 592; Minneapolis v. Street Railway Co., 215 U. S. 417, 430, 30 Sup. Ct. 118, 54 L. Ed. 259), yet it is, to say the least, gravely doubtful whether the asserted delegation by the state, contained in the company's charter, of authority to make a rate contract, carried with it the authority to make such rate perpetual.

Nor do we find anything in the resolutions of the general council subsequent to the extension act of 1886 which affects the question of extension of rate contracts.[9] Neither of these resolutions makes any reference whatever to the subject of rates of fare.

Nor do we find anything in the several minor franchises granted by the city to the Louisville Railway Company, the plaintiff here, since the adoption of the Constitution of 1891, which affects the question of the extension of rate contracts here in issue. While all provided for a five-cent rate of fare, each was awarded to plaintiff as the highest and best bidder under the provisions of the Constitution of 1891. Whatever may ultimately be thought to be the effect of these minor franchises upon a unitary operation, they cannot affect the propriety of the temporary injunction.

[9] It follows, we think, from the conclusion that the rate contracts were not extended by the 99-year extension of the railway charters, that the company, which is lawfully occupying the streets under legislative authority therefor, is not bound by a rate of fare in fact confiscatory, but has the right to invoke relief against the enforcement thereof. Such conclusion is, we think, fully supported by the San Antonio Case, 255 U. S. 547, 41 Sup. Ct. 428, 65 L. Ed. 777, which case, as intimated in our certificate, we regard as the applicable rule of decision rather than G. R. & I. Ry. v. Osborn, 193 U. S. 17, 24 Sup. Ct. 310, 48 L. Ed. 598. As applied to this case, we find nothing in the Iowa Cities Case, 255 U. S. 539, 41 Sup. Ct. 400, 65 L. Ed. 764, which conflicts with the San Antonio Case.

The evidence presented by the company in connection with its application for injunction made a prima facie showing of confiscatory rate, justifying the exercise of judicial discretion in favor of the issue of the writ. Not only are we not prepared to say that the court abused its discretion in denying the extension of time asked by the city for making a defensive showing, but, in view of the conclusion reached as to the nonexistence of rate contracts, we think the interests of both the city and the company, as well as the public interest generally, will be best served by giving immediate opportunity for fully trying out the merits of the claimed confiscation. Upon this subject we of course can have no opinion, nor are we called upon to decide what steps are necessary to the effecting of a new rate contract. Apart from the one

---

[9] As stated in our certificate already referred to, there are five of these resolutions. Each of the first three grants the right to construct and maintain lines on additional streets, and each says that the rates thereby granted shall continue with those now owned by the company in accordance with the Act of April 9, 1886 (Loc. & Priv. Acts 1885-86, c. 569). The last two permitted extensions, the same to be done under and according to existing contracts.

question of law which we have passed upon, the entire merits of the case are open to further hearing below.

We may add, what is of course, obvious, that the court below may properly entertain and decide any application which the city may make to modify or vacate the existing injunction, whether based on a showing of lessened cost of operation or upon a fuller showing of the controlling facts than the city has yet had an opportunity to make, or upon both, and that in the absence of further rate contract the injunction ought not to be continued in aid of any rate higher than reasonably necessary to meet temporary conditions as they may vary from time to time.

The order awarding temporary injunction is affirmed.

### On Petition for Rehearing.

By petition for rehearing, appellants ask that our recent decision, which affirmed the temporary injunction awarded by the District Court, be modified, so as to permit the city to enforce its five-cent fare contracts on all cars operated over the streets covered by the so-called "minor franchises." We said in our opinion that, "whatever may ultimately be thought to be the effect of these minor franchises upon a unitary operation, they cannot affect the propriety of the temporary injunction." We think the considerations adduced by appellants call for no modification of the conclusion stated.

[10] The temporary injunction, which this court affirmed, enjoined the city and its officers "from interfering with or obstructing the plaintiff [railway company] in any manner whatsoever in the charge to be made by it upon all or any of said lines of seven cents for the transportation of each passenger thereon." The city suggests that it may conclude that some temporary relief, by way of establishing a fare of less than seven cents, should be given to the railway company, and that with the injunction in force as now written the city is powerless to grant such relief. In our judgment, the affirmance of the temporary injunction, considered especially with what is said in that connection in our previous opinion, gives to the District Court full jurisdiction and authority to permit the suggested action on the part of the city, if by the court deemed proper, and that any application for relief in the respect stated should be made to that court. We may properly call attention to the statement in our opinion referred to that we are not "called upon to decide what steps are necessary to the effecting of a new rate contract."

The petition for rehearing and for modification of our opinion and order of affirmance is accordingly denied.