ATLANTIC COAST ELECTRIC RAILWAY COMPANY, PROSECUTOR, v. BOARD OF PUBLIC UTILITY COMMISSIONERS AND BOROUGH OF BRADLEY BEACH.

Argued June 7, 1916—Decided December 1, 1916.

1. When a traction company, organized under the General Traction act of 1893 (*Pamph. L., p.* 302; *Comp. Stat., p.* 5021), obtains from a municipality an ordinance granting a location of street railway tracks, and accepts the same, a regulation of the rate of fares contained therein, if lawful and reasonable, constitutes a contract between the company and the municipality which during the life of the franchise remains inviolable, and it is incompetent for the board of public utility commissioners to impose upon the company an additional burden in violation of such contract respecting fares.

2. An ordinance passed by a municipality pursuant to the General Traction act of 1893 (*Pamph. L., p.* 302; *Comp. Stat., p.* 5021), granting a location of street railway tracks, and providing therein respecting the rate of fare that "no more than five cents shall be charged by the company," gives the company, when accepted by it, a contract right to charge a five-cent rate, which rate cannot be reduced without the consent of the company.

3. Where an ordinance passed by a municipality pursuant to the General Traction act of 1893 (*Pamph. L., p.* 302; *Comp. Stat., p.* 5021), granting a location of street railway tracks, contained a restriction that the fare in a stated territory shall be "no more than five cents," and such ordinance is accepted by the company, such contract is binding both upon the company and the municipality, even though the territory covered by such fare zone is partly outside the corporate limits of the municipality.

On *certiorari*, &c.

Before GUMMERE, CHIEF JUSTICE, and Justices TREN-CHARD and BLACK.

For the prosecutor, *Durand, Ivins & Carton* and *Robert H. McCarter.*

For the board of public utility commissioners, *L. Edward Herrmann* and *Frank H. Sommer.*

For the borough of Bradley Beach, *Ward Kremer.*

The opinion of the court was delivered by

TRENCHARD, J.   The Atlantic Coast Electric Railway Company operates a trolley line or street railway from the junction of Main street and Cookman avenue, in Asbury Park, southerly through other municipalities and the borough of Bradley Beach to Belmar.   It also operates another branch from the northern terminus of the above-described line, eastwardly along Cookman avenue, in Asbury Park, and through that city and beyond.

On February 9th, 1916, the board of public utility commissioners, at the request of the borough of Bradley Beach, after a hearing, ordered "the Atlantic Coast Electric Railway Company to give to all persons boarding its northbound cars, in Bradley Beach, who on payment of fare of five cents on such cars request transfers to its cars operating easterly on Cookman avenue, Asbury Park, said transfers, the same to be accepted by the company for a ride on Cookman avenue easterly as far as Kingsley street, Asbury Park; and   *   *   *

to give to all persons boarding its westbound cars on Cookman avenue, who on payment of fare of five cents on such cars request transfers to its cars operating southerly on its Belmar line, said transfers, the same to be accepted by the company for a ride on its Belmar line to the southerly boundary of Bradley Beach."

This writ of *certiorari*, sued out by the company, brings under review the validity of that order.

We are of the opinion that it cannot be sustained.

Among other reasons urged against the order is that "the ordinances under which the company is operating through Bradley Beach, on the Belmar and Sea Girt line, provide for a five-cent fare to Cookman avenue, Asbury Park, and exact from the company annual payments in consideration of the privileges granted, and are contracts between the company and municipalities, including the borough of Bradley Beach, and the order of the board of public utility commissioners is in violation of these contracts and illegal."

The company was organized under the General Traction act of 1893 (*Pamph. L., p.* 302; *Comp. Stat., p.* 5021), and in 1897 obtained from the borough of Bradley Beach its ordinance above referred to. This ordinance was approved September 8th, 1897. It recites the application of the company for permission to construct, operate and maintain a new line of street railway through certain streets in accordance with a designated route, and grants such permission "to construct, operate and maintain a new line of street railway in, through and upon the public street or highway in said borough of Bradley Beach, commonly known as the main public road leading from Asbury Park through the borough of Bradley Beach to Belmar, called Main street, and extending therein from the extreme northern boundary line of said borough of Bradley Beach southwardly to the extreme southern boundary line of said borough, conformably to the route designated," &c. This is the line in question.

The twelfth section of the ordinance provides:

"That the rate of fare shall be five cents for the transportation of any passenger for one continuous ride on the cars of

said company, in any direction within the corporate limits of said borough, and *no more than five cents shall be charged by said company for the transportation of any passenger for one continuous ride in either direction on the cars of said company from Cookman avenue, in Asbury Park, to any point in Belmar on the route on said railway,* or to any other point on said route whenever said railway of said company shall be constructed and in operation over its said route between Asbury Park and the southern boundary line of the borough of Belmar."

The nineteenth section provides that the permission, rights and privileges thereby granted to the company shall continue for a period of fifty years. The twentieth section provides that as compensation for the rights and privileges thereby granted, the company shall, at its own cost and expense, grade and gravel stated portions of the street, and shall pay to the borough $250 annually during the fifty years for which the franchise is granted.

This ordinance was accepted by the company, the line between the two termini thereof was constructed and put in operation, a five-cent fare was established thereon, and the company has hitherto fulfilled its obligations as imposed by the ordinance.

It was, of course, under the law, necessary for the company to secure the consent given by the ordinance before it could build its trolley line through Bradley Beach.

And section 32 of the Traction act (*Comp. Stat., p.* 5035) provides:

"That any consent required by this act to be given by any public body may be given by a resolution or ordinance of such body, which consent, when accepted by any corporation created under this act, * * * shall have the force and effect of a contract."

The statute leaves the amount of compensation to be charged by such a company entirely open, there being no provision as to the rate of fares in the act. Other provisions of the statute, however, require that the company, before it shall construct its line, shall present to the governing body of the

municipality a petition and plan of construction, and the municipality, after consideration, shall "either pass a resolution refusing such location or pass a resolution or ordinance, as may be necessary or proper, granting the said location or any part thereof, *under such lawful restrictions as they deem the interests of the public may require,*" &c.   *Comp. Stat.,* p. 5025, § 7.

Now, in *Rutherford* v. *Hudson River Traction Co.,* 73 N. J. L. 227, Mr. Justice Pitney, for this court, speaking of this legislative provision, said:

"The 'lawful restrictions' that are to be made in the interest of the public indicate, likewise, a legislative act.   In short, the statute, as we take it, plainly imports that the common council or other governing body of the municipality is to perform a legislative function in granting a special user of the public highway to a traction company, and in setting bounds and limits to its user and imposing conditions thereon; while, on the other hand, the traction company likewise is dealt with as a public agency, and not a mere private entity; in its application to the council it not only seeks an opportunity for private profit, but it tenders itself a volunteer to the public service, offering to embark the capital of its stockholders in a public improvement and to assume correlative duties.   The proceeding has for its purpose the completion of the general 'charter' of the company by the acquisition of a local 'franchise.'   It results that when the franchise is granted, subject to conditions and restrictions, and when the traction company proceeds to lay its tracks in the street and run its cars thereon, that property and those franchises become impressed with a public use that imposes the duty upon every successive holder to serve the public in accordance with the terms of the original grant."

In view of the further provisions of the act that the consent required by the act to be given by the municipality, when accepted by the company, "shall have the force and effect of a contract," it has, of course, been frequently held that the restrictions thus imposed, if lawful and reasonable, constitute a contract between the company and the municipality which

thereafter remain inviolable. *Jersey City* v. *Jersey City and Bergen Railway*, 70 N. J. L. 360; *Jersey City* v. *North Jersey Street Railway Co.*, 72 *Id.* 383; *Newark* v. *North Jersey Street Railway Co.*, 73 *Id.* 265.

That regulations as to the rate of fare are properly classed among such "restrictions" seems quite plain.

Recently, Mr. Justice Voorhees, writing for the Court of Errors and Appeals, in *Reed* v. *Inhabitants of Trenton*, 80 N. J. Eq. 503, 506, said:

"That a municipality, as a condition precedent to granting permission to a traction company to construct and operate a street railway within its corporate limits has power to impose lawful restrictions, in the interest of the public, that *regulations of rates of fare are properly classed among such restrictions and come within the terms of the statute, and that the acceptance of such an ordinance by the company constitutes a contract are too well settled to require discussion.* The contract thus entered into is evidenced by the terms of the ordinance and is to be construed by the ordinary rules of law applicable to that subject."

As stated by the Supreme Court of the United States in *Detroit* v. *Detroit Citizens' Street Railway Co.*, 184 U. S. 368:

"The rate of fare is among the most material and important of the terms and conditions which might be imposed by the city in exchange for its consent to the laying of railroad tracks and the running of cars thereon through its streets. It would be a subject for grave consideration and conference between the parties, and when determined by mutual agreement, the rate would naturally be regarded as fixed until another rate was adopted by a like agreement."

It is, therefore, well settled that one of the "restrictions" which the municipality under the legislative authority may impose, as a condition of its consent to the location of tracks within its corporate limits, is the rate of fare that shall be charged, and such restriction, when the ordinance is accepted, becomes a contract. Any other interpretation of the statute is impossible, particularly in view of the provision to the effect

that such consent, with the restrictions, when accepted, shall constitute a contract.

Such a contract neither party can violate without the consent of the other. Should the company apply to the utility board to have the rate of fare increased, it would, undoubtedly, be met with its contract. The case of *Borough of North Wildwood* v. *Board of Public Utility Commissioners*, 88 *N. J. L.* 81, is not to the contrary. There the commission had authorized a higher rate than had been previously prescribed, and the only question was as to its power so to do against the objection of the municipality. The opinion says:

"While the municipality itself has not assented to a change in rate, the state, its creator and parent, has done so through a specially constituted agency. *If the water company were here complaining that its contract rights were being impaired, a different question would be presented;* but the contract right of one of the state's creatures may be waived by the creator."

The effect, then, of this ordinance, with its acceptance and action thereunder by the trolley company, being to constitute a contract between the company and the municipality, it is incompetent for the board of public utility commissioners, just as it is incompetent for the municipality itself, to violate that contract by imposing upon the company an additional burden. the effect of which is to require it to carry passengers for the same fare not to but beyond Cookman avenue.

But it is contended that the ordinance does not in fact entitle the company to charge a five-cent fare. We see no merit in this contention. The great weight of authority is that an ordinance which provides, as does the one in question, that "no more than five cents shall be charged," gives the company a contract right to charge a five-cent rate, which rate cannot be reduced without the consent of the company.

In *Cleveland* v. *Cleveland City Railway Co.*, 194 *U. S.* 517, the street railway company had similar rights under ordinances, one of which provided that the company *"should not charge more than five cents fare"* each way for one passenger over the whole or any part of its line. The city of Cleveland

undertook to reduce the fare. The Supreme Court of the United States, after showing that the legislature of Ohio lodged in the municipal council of Cleveland power to contract with street railway companies with respect to the terms and conditions upon which such roads might be constructed and operated, held that such ordinances when accepted became contracts between the company and the municipality, which the municipality was powerless to abrogate, and that the new ordinance seeking to reduce the fares impaired the contract. That court had already held, in *Detroit* v. *Detroit Citizens' Street Railway Co., supra*, that the language of an ordinance which provides that the rate of fare for one passenger *"shall not be more than five cents,"* does not reserve or give to the city any right to reduce such fare below the rate of five cents established by the company. To the same effect is *Cleveland* v. *Cleveland Electric Railway Co.,* 201 *U. S.* 529, and also *Minneapolis* v. *Minneapolis Street Railway Co.,* 215 *Id.* 417.

It remains, then, to consider whether or not the restriction is a lawful one, and it has been suggested that inasmuch as it undertakes to apply to passage beyond the corporate limits of the borough, it is *ultra vires* the municipality. We think, however, there is no merit in this suggestion.

The prosecutor was a trolley company, chartered, and proposing to run a line from Asbury Park to Belmar. It applied to Bradley Beach, an intermediate municipality, for permission to locate its tracks through that borough. That municipality was authorized to impose lawful restrictions in the interest of the public. The other municipalities involved, by ordinances locating the tracks of the line in question through their respective territories, imposed similar restrictions, so that the territory between Belmar and Asbury Park constituted one-fare zone. We think that the municipality of Bradley Beach might legitimately conclude, as it did, that the "public interest" justified it in exacting, as a condition of the privilege to the company to operate within its corporate limits, that a stated fare be exacted over a given territory, notwithstanding such territory is partly outside its corporate limits. It is unnecessary for the borough in upholding its

exactions to operate beyond its boundaries. It simply requires the trolley company, as a condition of its contract, to make a certain agreement with reference to its fare. In *Reed* v. *Inhabitants of Trenton*, 80 *N. J. Eq.* 503, *supra*, the ordinance of the city of Trenton under review expressly provided that—

"The rate of fare within the present limits of the city of Trenton for each passenger shall be three cents, and outside of the city limits, within a radius of five miles, five cents * * * *"

It was not intimated either by the Chancellor or by the Court of Errors and Appeals that the five-cent provision applying outside of the city limits was for that reason illegal. On the contrary, the Chancellor said that "the power of the city to impose the terms and conditions in the ordinance contained is undoubted," and the Court of Errors and Appeals seems to have regarded the acceptance of an ordinance with such a condition as a contract binding both the city and the accepting company. What the court decided was that the company in procuring the franchise with that provision from the city of Trenton did not and could not bind other companies. It was not intimated or suggested that if the lines of the applicant itself had extended beyond the city limits it would not have been bound by the rate.

In *Rice* v. *Detroit, &c., Railway*, 122 *Mich.* 677; 81 *N. W. Rep.* 927, the franchise granted by the township of Dearborn was under consideration. The franchise provided for the sale of trip tickets on cars of the company at a reduced rate between a village in the township and a city outside the township. Chief Justice Montgomery said (at *p.* 928) :

"We have, then, a case in which defendant is operating under a franchise imposing a duty to sell five tickets for fifty cents, good between the city hall, Detroit, and any point in the village of Dearborn. * * * It is contended that the franchise is in force only within the territorial limits of the village and does not cover territory in other townships. We do not think this contention can be sustained. The franchise is in the nature of a contract, and imposes obligations upon the company which those having occasion to ride from Dear-

born to Detroit have a right to enforce.  *  *  *  The defendant saw fit to contract with the village of Dearborn for a rate outside the limits of the village, and to agree that tickets should be sold on its cars.   This contract it cannot repudiate."

A somewhat analogous situation is dealt with in *Camden and Amboy Railroad Co.* v. *Briggs*, 22 *N. J. L.* 623, where a charter of a railroad company restricting rates to be charged by a railroad company beyond the limits of the state was sustained.   The reasoning of this case, as well as of *Raritan and Delaware Bay Railroad Co.* v. *Delaware and Raritan Canal Co.*, 18 *N. J. Eq.* 546, is applicable.   It is common knowledge that municipalities frequently make exactions of this character, and they are not to be vitiated for that reason.

The order under review will be set aside.