## Johnson County Gas Company v. Stafford.

## Johnson County Gas Company v. Pendleton, et al.

(Decided March 9, 1923.)

### Appeals from Johnson Circuit Court.

1.  Gas—Town Board of Trustees Can Contract with Gas Company to Increase Rates Permitted by Franchise.—It is within the power of the board of trustees of a town to pass ordinances amending a

gas company's franchise so as to increase the rates which might be charged by the gas company during the life of the original franchise, which ordinances, when accepted by the company, become a contract for the increased rates.

2. Municipal Corporations—Constitution Does Not Require Advertisement for Bids Before Contracting with Reference to Franchise.— Constitution, section 164, providing that no municipality can grant a franchise or privilege, or make a contract with reference thereto for a term exceeding twenty years, and that before granting the franchise or privilege the municipality shall first, after due advertisement, receive bids therefor publicly, does not require an advertisement for bids before a town can make a contract with reference to an existing franchise.

3. Municipal Corporations.—Increase of Rates Permitted by Franchise is not "Grant of Franchise" Within Constitution.—The enactment of ordinances amending an existing gas franchise so as to increase the rates which the company is authorized to charge during the existence of the franchise is not the granting of a franchise within Constitution, section 164, requiring an advertisement for bids before any franchise is granted.

4. Gas—Franchise Can Permit Charge for Meter Service.—Since there is no statutory provision prohibiting a gas company, when authorized by its contract, from charging a meter rent in addition to the other charges, a town can amend a gas franchise ordinance so as expressly to permit the meter charge.

5. Gas—Public Interest in Preventing Bankruptcy of Gas Company is Consideration for Granting Increase of Rates.—Where it appeared that a gas company was losing money and could probably not continue to operate, or would be forced into bankruptcy, if the rates were not increased, the interest of the public in continuance of the service was a good and valid consideration for the enactment by the board of trustees of ordinances amending the franchise so as to permit the company to charge increased rates.

6. Gas—Question of Consideration for Franchise is for Contract Making Body in Absence of Fraud.—The presumption is that municipal authorities acted in good faith in amending a gas franchise so as to permit the charging of increased rates, and the question of consideration for such amendment, in the absence of fraud or such flagrant misconduct as indicates fraud, is with the contract making body of the municipality.

7. Gas—Rate Fixed by Municipal Body Presumed Just.—There is a presumption that the municipal body empowered by law to make contracts for the supply of gas would make a contract only for a just and reasonable rate.

8. Gas—Evidence Held to Show Increased Rate Granted by Board of Trustees was Just.—Evidence that a gas company had never been able to earn a fair return on its actual investment in addition to a reasonable replacement fund, and that the cost of operation of its works had been greatly increased during the war years, held to

- show that increased rates granted by ordinances amending the
. franchise were just and reasonable.

9. , Gas—Factors Entering Into Determination of Reasonable Rate
    Stated.—In determining what is a reasonable rate for gas, there
    . must be considered the right of the investors to a fair return on
    _ their money, since their control has been largely taken over by the .
    municipality, the present value of the company's plant, the quantity
    of gas consumed, the cost price of the plant, and the cost of the
    gas, the fair and reasonable expense of operating the plant, con-
    sidering the economic conditions at the place of operation, and,
    based on all of these considerations, the company is entitled to such
    return in the form of gross profits as will meet these amounts and
    furnish a fair return and a replacement fund which will assure a
    return of the original investment at the end of the life of the fran-
    chise.

10. Gas—Fair Return on Investment and Percentage of Replacement
    Vary with Localities.—What is a fair return upon an investment
    in a gas corporation, and what is a fair percentage to be credited
    to a replacement fund, vary greatly in different localities, and de-
    pend largely on the volume of business transacted, the local cus-
    toms as to such investments, and the risk involved in the particular
    kind of business.

11. Gas—Board of Trustees for Town of Sixth Class has Power to fix
    Reasonable Gas Rates.—Under Ky. St., section 3704, subsec. 1, giv-
    ing the board of trustees of towns of the sixth class power to pass
    ordinances not in conflict with the Constitution or laws of the Com-
    monwealth, or of the United States, and subsection 7, empowering
    them to perform all other acts necessary to carry out the provis-
    ions of the chapter and to enact and enforce all other local, police,
    sanitary, and other regulations as to do not conflict with the gen-
    eral laws, the board of trustees has authority to fix by ordinance
    reasonable rates which may be charged by a gas company under its
    franchise.

FREDERICK HOWES for appellant.

W. H. VAUGHAN & SON for appellees.

OPINION OF THE COURT BY TURNER, COMMISSIONER—
Reversing.

In July, 1912, the board of trustees of the town of
Paintsville, then a town of the sixth class, by ordinance
directed the sale of a franchise granting the right and
privilege of furnishing and supplying that town and its
inhabitants with natural gas for heating and lighting
purposes, carrying with it the right to the purchaser to
lay, maintain and operate gas pipes in the town for that
purpose.

Thereafter such franchise was sold and W. J. Rowland became the purchaser, and on the 1st day of August, 1912, the franchise was granted to him, his heirs, associates and assigns.

It was provided in the franchise that the purchaser, his heirs, associates and assigns, as a condition of the exercise of the rights, privileges and grants contained therein, or any of them,

"Shall furnish for public and private use for the said town and its inhabitants natural gas for the purpose aforesaid at a price which in no event is to exceed the rate of thirty-eight cents per one thousand cubic feet for natural gas, with a discount of three cents per one thousand cubic feet if paid at the office of the purchaser or assigns in the town of Paintsville on or before the tenth of the month following that in which the gas is consumed."

A similar provision was contained in the contract made with Rowland after the purchase.

Thereafter appellant corporation was organized, to which an assignment was made by Rowland of his franchise and the contract thereunder.

Appellant was not a producer of natural gas, but was organized primarily for the purpose of distributing gas under the terms of the franchise. Accordingly, shortly after its organization it proceeded to install its plant in Paintsville, together with all the machinery, equipment and appliances necessary to its operation and to lay throughout the town of Paintsville its mains and connecting pipes. It likewise became necessary for it to lay about six miles of a main pipe so as to connect with the mains of a producing gas company, from which it was to purchase under the terms of a contract its supply of gas.

The capitalization of the company was fifty thousand dollars, but there was actually paid in only twenty-five thousand and forty dollars in cash, all of which was expended in installing the plant, purchasing the machinery and equipment and laying the pipes and mains referred to. The balance of the capital stock of fifty thousand dollars was represented by the franchise and the contract which Rowland had with the producing gas company prior to the organization of the corporation.

The gas company continued to operate under the terms of the original franchise for approximately eight years and until September, 1920, when the board of trustees of the town of Paintsville passed an amendatory

ordinance authorizing the company to charge a minimum rate of one dollar per month per meter for natural gas furnished, and also authorized a maximum charge of forty cents per thousand cubic feet of natural gas furnished, with a provision, however, that the minimum charge shall be embraced in and be a part of the flat maximum rate of forty cents per thousand cubic feet, meaning thereby, as we interpret it, that both the flat maximum rate and the minimum meter rate should not be charged against a customer at one and the same time.

The company only operated under this amendatory act for about two months and until November, 1920, when the board of trustees passed a second amendatory ordinance wherein it was provided that the company might charge a meter rate of one dollar per month for each meter furnished, and might charge not to exceed thirty-five cents per thousand cubic feet for gas consumed during the months of January, February and March of each year, and not to exceed forty cents per thousand cubic feet of gas consumed in the remaining nine months of each year. In each of the amendatory ordinances it was further provided in the event the gas company or its assigns should at any time in the future secure the gas at a lower rate than they were then paying, the charges fixed in the amendatory ordinances should then be reduced one-half of the difference between the price then being paid and the lower future price at which the same might thereafter be secured.

These two actions are by citizens of the town of Paintsville, and each calls in question the validity of the two amendatory ordinances. One of the actions is a personal one and involves only the rights of the individual plaintiff, while the other is by one or more taxpayers suing for their own benefit and the benefit of other residents of the town similarly situated. The two actions, however, in their essential features, raise the same question; they were heard together in the lower court, and will be here.

The lower court granted the injunction sought in each case and enjoined the gas company from charging or collecting from the citizens of the town during the life of the original franchise any rate in excess of the rate fixed in the original franchise, and held each of the amendatory ordinances to be void and of no effect.

On this appeal by the gas company the following questions are raised:

1. Was it within the power of the board of trustees to pass the amendatory ordinances increasing the rates which might be charged by the gas company during the life of the original franchise?

2. Was it within the power of the board of trustees to pass the amendatory ordinances putting into effect a higher rate without first offering for sale a new franchise under the provisions of section 164 of the state Constitution?

3. Was it within the power of the board of trustees to fix a charge for meter service?

4. Must there be a consideration shown for the passage of an ordinance increasing charges by public service corporations, or is the question of consideration therefor with the municipal legislative body?

5. Are the rates fixed in the amendatory ordinances just and reasonable?

(1) On the first question there is no difficulty. This question is in no essential feature different from the precise question raised and considered in the case of Lutes v. Fayette Home Telephone Company, 155 Ky. 555. That was an action seeking to have it declared that an amendatory ordinance and contract entered into by the city council of Lexington with the telephone company whereby the latter might charge during the life of the original franchise higher telephone rates than were specifically fixed in the original franchise and contract, was invalid and beyond the power of the city council.

In that case not only was it held that the city through its legislative body might during the life of the franchise, contract to change the scale of prices theretofore fixed by it and a public service corporation, but it was distinctly held that a citizen of such municipality has no vested right in such scale of charges so agreed upon, and that the charging of same is wholly a matter of contract between the legislative body of the city, which originally had the power to make the contract, and the public service corporation itself.

In this case, as in that, the public service corporation accepted the amendatory ordinances and thereby entered into a new amendatory contract with the municipality.

Seeing no difference whatever between that case and this we will not further elaborate this question.

(2) Section 164 of our Constitution provides:

"No county, city, town, taxing district or other municipality shall be authorized or permitted to grant an,

franchise or privilege, or make any contract in reference thereto, for a term exceeding twenty years. Before granting such franchise or privilege for a term of years, such municipality shall first, after due advertisement, receive bids therefor publicly, and award the same to the highest and best bidder.''

Under this provision it is the earnest contention of counsel for appellee that the changing of the rates prescribed in the original franchise by the amendatory ordinances was equivalent, under the terms of the quoted section, to the granting of a new franchise, and that as no franchise may be granted until due advertisement and public sale thereof, the amendatory ordinances were void.

But an anlysis of the language used in that section will readily disclose the fallacy of this view; the inhibi tion in the first place is against the granting of any franchise or privilege or the making of any contract in reference thereto for a term exceeding twenty years, but in the succeeding sentence wherein provision is made for the advertisement and public sale, it is only said that such franchise or privilege—not contract or amendatory contract—''Shall first, after due advertisement, receive bids therefor publicly, and award the same to the highest and best bidder.'' The inhibition is against the granting of a franchise or privilege or making a contract for a term exceeding twenty years, and further against granting a franchise or privilege without advertisement or public sale, but there is no inhibition expressed or implied against entering into a contract or amendatory contract except that the same shall not be for a term exceeding twenty years.

The franchise in this case was already in existence; the right of the company to lay its pipes and mains in the streets of the town under its original franchise was fixed, and the amendatory contracts did not in any way seek to place upon the streets or public ways of the town any new burden whatsoever, but purposed only to change the fixed rates theretofore specified in the contract made between the town and the purchaser of the franchise simultaneously with its purchase. The section from its language seems to provide that while a franchise can only be granted after due advertisement at a public sale, at the same time it seems to contemplate that a contract with reference thereto may be made

without such advertisement and sale, provided it is not made for a term exceeding twenty years.

It seems perfectly clear in this case that in the passage of the amendatory ordinances by the board of trustees and the acceptance thereof by appellant, no new franchise was considered or contemplated and no new burden upon the streets and public ways of the city was in mind; on the contrary the only thing dealt with was the changing of the rates which appellant might charge for the rendition of a service to the public.

While the precise question is not dealt with in the Lutes case, to which we have referred, the facts recited in the opinion show there was no advertisement or sale had in that case, and it is clear if the court had then thought the changing of the rates amounted to the granting of a new franchise, it would necessarily have held in that case the amendatory contract was void for the want of advertisement and public sale.

(3) The charge for meter service is attacked as invalid, and reliance in support of that view is had upon the cases of Louisville Gas Company v. Dulaney, 38 S. W. 703, and Capital Gas & Electric Company v. Gaines, 49 S. W. 462. It is true the two cases cited hold that the charge for meter rent was unauthorized in each of those cases, but the holding was based wholly upon the charters of the two gas companies involved. Each of the companies was operating under a special charter providing in substance they were to furnish gas to private consumers at a fixed price, and the court held in construing the charters they were prohibited from charging a higher price under the guise of charging a meter rent.

But the amendatory ordinances here fix not only the maximum prices, but in the same ordinance expressly permit the charge, in addition, of a meter rate.

There is in this state, so far as we know or can ascertain, no statutory provision prohibiting a gas company when authorized by its contract with a municipality from charging a meter rent in addition to the other charges. In fact it is apparent from the amendatory ordinances in this case that the meter charge is fixed as a part of the maximum charges.

While the precise question in this case has not heretofore been presented in this court, the right, when not prohibited by law, to fix a meter rate seems to be generally upheld. State v. Sedalia Gas Light Company,

34 Mo. App. 501; Smith v. Capital Gas Company, 64 Pac. 258 (Cal.); Amesbury Gas Company v. Gibney (Mass.), 97 N. E. 88.

(4) But it is said there is no consideration for the passage of the amendatory ordinances granting the privilege of charging higher rates, and that, therefore, the ordinances are invalid.

In the first place the record discloses a very good and valid consideration upon which the board of trustees acted, and that is it was made to appear to the board that the gas company was gradually running behind and had made no money and could not, probably, continue to operate, or would be forced into bankruptcy if the rates were not increased. The board, acting for the public, deemed it to be the interest of the citizens of the town that the gas company should not be forced into bankruptcy and should not be compelled to operate at a loss and to ultimately discontinue the service to the people. They probably conceived it would be a great inconvenience to the citizens of the town to be deprived of the natural gas, which is generally considered to be the ideal domestic fuel, and in this view of the matter it is perfectly clear there was a valid consideration, and that the board was actuated in granting the increased rate by its desire to protect the public and continue the gas service to the citizens of the town.

Not only so, the presumption is that the municipal authorities acted in good faith, and the question of consideration, in the absence of fraud or such flagrant misconduct as indicates fraud, is with the contract making body of the municipality.

Not only is there here no charge of fraud or misconduct upon the part of the municipal authorities, but it is conceded that the municipal board was made up of high class, clean and upright men and that in their action in passing the amendatory ordinances they were actuated by only good motives. Not only so, it is shown that before taking action on either of the amendments they had access to the books of the gas company and some of the members had investigated those books, or had it done, and their action in each instance was based upon this investigation.

(5) On the question of the reasonableness of the rates, we start out with the presumption that the municipal body empowered by law to make contracts would make a contract only for a just and reasonable rate.

Without going into detail of the great mass of evidence before us, we may say that for the first eight years when appellant was operating under the original franchise, taking the actual cash invested in the enterprise as the basis, the investors received a very inadequate return upon their money. During three of those eight years no dividend was declared whatsoever, and during the other five years in the aggregate only sixty-two hundred and fifty dollars were declared in dividends. There is no showing there was any mismanagement, or that the expense of operating the gas plant was unusually high or that it could have been operated at a less expense. On the contrary, as will be seen, the operating expenses during those years appear to have been unusually low. During that period the gross proceeds from the sale of gas was approximately fifty-five thousand dollars, and that. same gas had cost appellant about thirty thousand three hundred dollars. As well as we can ascertain with any accuracy from the more or less confused accounts in the record, the operating and distributional expenses during the eight years in question were approximately eighty-five hundred dollars, which, as we have said, are exceedingly reasonable. The operation of a municipal. natural gas plant is an exceedingly technical business; it involves the distribution of a highly inflammable and dangerous mineral substance through a network of mains and pipes of different sizes; it involves the use and control of delicate instrumentalities designed to control the pressure at which the gas shall reach the consumer; it involves the keeping in repair of all its mains and pipes underground to the end not only that the gas may through them ultimately reach the consumer, but to the further end that leakage may be avoided, which would not only involve a loss upon the operator, but which might result in explosions subjecting him to liability for damages; it likewise involves the keeping in repair the meters so that they may accurately register the gas consumed, as well as the keeping in repair of a great many other instruments and the doing of many things necessary to the efficient administration of such a plant.

Taking, therefore, the thirty thousand three hundred dollars paid for gas, the eighty-five hundred dollars paid out in expenses, and add to those the sixty-two hundred and fifty dollars of dividends, and adding to that the fifteen hundred and eighty-three dollars invested by the company in government securities, there is left only

about nine thousand dollars for a replacement fund during those eight years. In determining what is a reasonable rate many things enter into the estimate. It is universally recognized that the investors in public service corporations are entitled to a fair return upon their money; when they invest it in such enterprises its control in a large measure passes from them, for the municipality where the public service corporation is operated has not only considerable control over the corporation, but has certain rights of regulation as to its conduct and operation. The present value of the company's plant must be considered as well as the quantity of gas consumed by its patrons; the cost price of the plant as well as the cost of the gas distributed by it; the fair and reasonable expense of operating the plant, and in determining this the economic conditions at the place of operation must be considered. Taking all these things into the estimate, the company is entitled to such return in the form of gross profits as will account for all these, and yet furnish a fair return to the investors for their money, and at the same time provide a replacement fund which will assure to them the return at the end of the life of the franchise of their original investment.

What is a fair return upon such an investment, and what is a fair percentage to be credited to a replacement fund, vary greatly in different localities, and depend largely upon the volume of business transacted and the local customs as to such investments, as well as the risk involved in the particular kind of business.

It follows from this that the reasonableness of the rate and what is a fair return to the investor are necessarily questions of fact to be determined from the facts and circumstances in each case. The evidence in this case is that a return of from seven to eight per cent is customary upon such investments at Paintsville and in that locality, and that a replacement fund of at least five per cent should be set aside each year during the twenty years of the life of the franchise, in order that the investors may have at that time their property returned to them or, in other words, have their plant in practically as good condition as when installed.

The gas company's operations for one year under the rates fixed in the last ordinance show that over and above all of these fixed charges there was not realized exceeding from twelve to thirteen per cent net profit,

and accepting the evidence above stated as correct we are unable to see that it will give to the investors any more than a fair return upon the money actually expended in the installation of the plant. It is true the expenses of this corporation appear to have been very much greater the last year of its operation, but we know as a matter of current history that during the latter years of the world war, and up to this time, labor and materials—particularly the kind of materials used by a gas company—have enormously increased the cost of such operations.

Relying, therefore, upon the presumption of the reasonableness of the rate because it was fixed by the municipal body charged with that responsibility, and relying upon what we conceive to be the reliable evidence gleaned from this record and from the books of the gas company, we are unable to say that the rates so fixed are unreasonable or that they will result in an exorbitant or unreasonable return to the investors. 12 R. C. L. 190; 1st Thornton's Law of Oil and Gas, page 616; 28 Cyc. 296-7; 28 C. J., pp. 579-80; Cedar Rapids Gas Light Co. v. Cedar Rapids, 144 Ia. 426, 138 A. S. R. 299, 48 L. R. A. (N.S.) 1025, and 223 U. S. 655; Consolidated Gas Company v. New York, 157 Fed. 849, 212 U. S. 19, 15 Ann. Cas. 1034; People v. Public Service Commission, 194 App. Div. 578, 186 N. Y. S. 177; Lincoln Gas Co. v. Lincoln, 223 U. S. 349; State Public Utilities Commission v. Springfield Gas Company, 291 Ill. 209; Newark v. Newark Natural Gas Company, etc., 29 Ohio Cir. Ct. (N. S.) 254; Public Service Gas Company v. Public Utility Commissioners (N. J.), L. R. A. 1917B 930, L. R. A. 1918A 421; Lincoln Gas Company v. Lincoln, 250 U. S. 256; Landon v. Public Utilities Commission, 234 Fed. 152, 249 U. S. 236.

But it is contended by appellees that the power to fix rates is in the state, and that no municipality has that power unless the same has been delegated to it by the general assembly; and that there has not been delegated to the town of Paintsville this authority by the charter of towns of the sixth class.

We find in section 3704, Kentucky Statutes, a part of the charter for towns of the sixth class, and in subsection 1, this authority is granted to the board of trustees:

"The board of trustees of such town shall have power to pass ordinances not in conflict with the Constitution or laws of the Commonwealth or of the United States."

And we find that supplemented in subsection 7 of the same section by the following provisions granting general police, sanitary and other powers, to-wit:

"To do and perform any and all other acts and things necessary or proper to carry out the provisions of this chapter, and to enact and enforce within the limits of such town all other local, police, sanitary and other regulations as do not conflict with general laws."

Under this broad and comprehensive delegation of legislative authority it would be highly technical to say that the legislature did not intend to expressly authorize such municipalities to take steps to give their inhabitants the benefit of all desirable public service, and to do the things necessary to insure them in the enjoyment of the same. To so hold would be to say that it was the legislative purpose to withhold from such small towns the right to the enjoyment of such utilities.

The judgment is reversed in each case with directions to set aside the judgments granting the injunctions and to dismiss each of the petitions.