## CITY OF COVINGTON, KY., v. CINCINNATI, N. & C. RY. CO.

### No. 6466.

Circuit Court of Appeals, Sixth Circuit.

Feb. 13, 1934.

As Amended on Denial of Rehearing June 29, 1934.

Sawyer A. Smith, of Covington, Ky., C. W. Yungblut, of Newport, Ky., Charlton B. Thompson, of Covington, Ky., and Helm Woodward, of Cincinnati, Ohio, for appellants.

L. K. Langdon and C. S. Weakley, both of Cincinnati, Ohio, Chas. W. Milner, of Louisville, Ky., F. M. Tracy, of Cincinnati, Ohio, and Matt Herold, of Newport, Ky., for appellee.

Before MOORMAN, HICKENLOOPER, and SIMONS, Circuit Judges.

MOORMAN, Circuit Judge.

This is an appeal from an order of the District Court for the Eastern District of Kentucky granting a preliminary injunction enjoining certain Northern Kentucky cities from interfering with the Cincinnati, Newport & Covington Railway Company in charging a 10-cent cash or a 7½-cent token fare for a single ride on its lines from the Kentucky cities to the northern terminus of the railway company in Cincinnati, Ohio. The appellant cities, while a part of the metropolitan area of Cincinnati, are separated from that city by the Ohio river. They are themselves divided by the Licking river, but are connected by bridges across that river. The appellee is a Kentucky corporation operating a street railway system throughout the appellant cities and over bridges connecting Newport and Covington with Cincinnati to its terminus in the latter city. It was organized by special act of the General Assembly of Kentucky under the name of the South Covington and Cincinnati Street Railway Company, but in 1922 amended its charter and changed its name to Cincinnati, Newport & Covington Railway Company. Shortly after it was organized it acquired a franchise in Covington, and it later acquired and now owns all franchises and rights granted by the Kentucky cities to other street railway companies, and it operates its lines under these franchises, with lines crossing the Ohio river, as a unit under a single management. It is engaged exclusively in transporting passengers, and is not operated as a part of, or in connection with, any other transportation system.

The bill sufficiently alleged federal and equity jurisdiction. Detroit v. Detroit Citizens' St. Ry. Co., 184 U. S. 368, 22 S. Ct. 410, 46 L. Ed. 592; San Antonio v. San Antonio Pub. Serv. Co., 255 U. S. 547, 41 S. Ct. 428, 65 L. Ed. 777; City of Louisville v. Louisville Ry. Co., 281 F. 353 (6 C. C. A.); Id., 39 F. (2d) 822 (6 C. C. A.). It sought an injunction against interference with the company's proposed increase of its intrastate fares in Kentucky, as well as its fares from Kentucky to Cincinnati, and also against interference with a change in its method of operating its cars from a two-man operation to a one-man operation. The trial court did not pass on the motion for an injunction so far as it related to intrastate fares or the proposed change in the manual operation of the cars. The sole question presented to us for decision, therefore, is whether the court rightly enjoined interference on the part of the municipalities with the proposed increase in fares from points in Kentucky to the terminus of the company's lines in Cincinnati.

It is a settled rule of equity procedure that, where the question presented on an appeal from an order granting or refusing a preliminary injunction is solely one of law, and the record shows that the trial court did not exercise discretion in any matter of fact or expediency, the appellate court will consider the question presented, and will direct the granting or withholding of the injunction as the law requires. Cumberland Telephone Co. v. City of Memphis, 200 F. 657, 658 (6 C. C. A.). In the instant case, the order appealed from was based on the trial court's

view of the legal question presented by undisputed evidence, and hence the question is at large in this court.

For many years the appellee has charged a 5-cent fare from the Kentucky cities to Cincinnati. It appears in the proofs that 70 per cent. or more of its traffic originating in these cities is interstate traffic for Cincinnati. It further appears that for several years it has not earned the interest on its bonds, and since January 1, 1930, it has been operating at a substantial loss. It may thus be accepted for the purpose of decision that the 5-cent fare it has heretofore charged is inadequate, and that reasonable rates for such service would not exceed those which it proposes to establish. Upon this hypothesis we proceed to examine the reasons advanced by appellants in support of their contention that the appellee is bound to maintain a 5-cent rate of fare.

▆ Seven of the cities, Bromley, Park Hills, Fort Mitchell, South Fort Mitchell, Fort Thomas, Clifton, and Southgate, make no claim to any contract rights. They contend, or rather, contended in the court below, though the point is not urged before us, that the proposed increase is prohibited by section 848 of Kentucky Statutes, which provides that no person or corporation shall use, or be permitted to use, any bridge across a river forming a boundary of the state where the bridge is operated by a consolidated corporation, as defined in section 843 of the statutes, except upon condition that it carry passengers from any city or town in the state in which it may operate street railway cars to all points in any other state to which it may operate its cars for a single cash fare of 5 cents for each passenger. Violation of this statute is made an offense under section 850, Kentucky Statutes, punishable by a fine of not less than five hundred nor more than one thousand dollars. In the first place, the statute applies only to the operation of cars over bridges owned and operated by consolidated corporations (Commonwealth v. L. & N. R. R. Co., 148 Ky. 94, 146 S. W. 767), and it does not appear in the record before us that either of the bridges over which the appellee operates is owned by such corporation. If it be assumed, however, that the bridges do come within this provision of the statute, and it would seem that the bridge between Covington and Cincinnati is to be so classified (Covington & Cincinnati Bridge Co. v. Kentucky, 154 U. S. 204, 14 S. Ct. 1087, 38 L. Ed. 962), the statute is nevertheless unavailable to defeat the increase, because according to its terms. it is an unconstitutional attempt to regulate commerce between the states. This was the view taken by the trial court on authority of Covington & Cincinnati Bridge Co. v. Kentucky, supra, and South Covington Ry. Co. v. Covington, 235 U. S. 537, 35 S. Ct. 158, 59 L. Ed. 350, L. R. A. 1915F, 792, and we think it is right. Since, therefore, the cities mentioned base their claims upon no other ground than the inhibitions of this statute, it must be held that as to them the injunction was rightly granted.

▆ The other appellants rely upon contract rights written into franchises granted to the appellee and its predecessors. The provisions under which these rights are claimed vary according to their verbiage. As to each there is the initial question of the right of a city and a street railway company to contract for interstate street railway fares. The appellee contends that the commerce clause of the Constitution forbids the making of such a contract. It concedes that Congress has never exercised the authority conferred upon it by that clause of the Constitution to regulate street railway companies carrying passengers between states (Omaha Street Ry. Co. v. Interstate Commerce Commission, 230 U. S. 324, 33 S. Ct. 890, 57 L. Ed. 1501, 46 L. R. A. (N. S.) 385), and it does not claim that the fares here in question are subject to control by the Interstate Commerce Commission because they work an unjust discrimination against other interstate rates, as was the case in United States v. Village of Hubbard, Ohio, 266 U. S. 474, 45 S. Ct. 160, 69 L. Ed. 389.

Admittedly there is no power in either a city or a state to impose an undue burden on interstate commerce by the regulation of interstate rates, even though the commerce be carried on through an instrumentality over which Congress has not exercised its control. Covington & Cincinnati Bridge Co. v. Kentucky, supra; South Covington Ry. Co. v. Covington, supra; Buck v. Kuykendall, 267 U. S. 307, 45 S. Ct. 324, 69 L. Ed. 623, 38 A. L. R. 286; Bush Co. v. Maloy, 267 U. S. 317, 45 S. Ct. 326, 69 L. Ed. 627; Public Util. Comm. v. Attleboro Co., 273 U. S. 83, 47 S. Ct. 294, 71 L. Ed. 549. It is contended by the appellee that a contract for rates is in effect a regulation. We do not think so. A contract is the result of the meeting of minds free to make decisions. Regulation involves the exercise of compulsion, the imposition of a superior power. We must deal here, therefore, not with the regulation of interstate rates, but with the subjectability of such rates to contract. There being no power

in the state or the city to regulate them, and Congress not having exercised its regulatory powers, it would seem to follow necessarily that the carrier is left free to make its own contracts. That is what the carrier by steam railroad did prior to the enactment of the Act to Regulate Commerce of 1887 (49 USCA § 1 et seq.), subject, of course, to the condition that, if it exacted an exorbitant rate, the shipper might recover the excess over a reasonable charge. Arizona Grocery v. Atchison Ry., 284 U. S. 370, 383, 52 S. Ct. 183, 76 L. Ed. 348. In this early period of pre-regulation of railroads it was never supposed, if we may judge from the reported cases, that the carrier did not have the right to make contracts for interstate rates. Indeed, if we view this suit from the standpoint of its ultimate purpose, we are compelled to observe that the appellee is here seeking to free itself from existing contracts for interstate rates in order that it may make other contracts for such rates with the individual users of its cars. We think there can be no doubt that the interstate rates of a street railway company are subject to determination by contract, and that a contract with a city for such rates for a fixed period of time is valid if the city itself possessed the power to make the contract. It is, of course, true that a contract covering rates of this character can be valid only so long as Congress does not exercise its regulatory power, and when that power has been exercised, the contract rights must then yield to the congressional regulation. L. & N. R. R. Co. v. Mottley, 219 U. S. 467, 31 S. Ct. 265, 55 L. Ed. 297, 34 L. R. A. (N. S.) 671; New York v. United States, 257 U. S. 591, 601, 42 S. Ct. 239, 66 L. Ed. 385.

The interstate fares of the appellee being a matter about which it could contract, the next inquiry is whether the appellants had the power, in the interest of their residents, to enter into contracts with the appellee for maximum interstate fares on its lines. It is true that in Kentucky the power to regulate the rates of street railways in cities is a power vested in the state, and, unless there is a delegation of the power, the city has no right of regulation (City of Louisville v. Louisville Ry. Co., supra); further it will not be presumed that the state has surrendered all of its power of regulation unless the intent so to do clearly appears in the delegating act. If the controversy in the case at bar related to a contract with reference to rates within the city, the power of the city to make such a contract would have to be determined in the light of these applicable rules of law, but the case here presented raises no question of the power of the city to contract with reference to intracity rates. What we are concerned with is the city's power to contract for interstate rates without the city—rates which neither it nor the state has any power to regulate. These rates are nevertheless susceptible to control by contract, and the question then is whether a Kentucky city, having power to fix the terms and conditions on which it will permit a street railway to use its streets, may require the railway company to agree, as one of the conditions thereof, to charge the residents of the city a specified rate for interstate transportation outside the city. It has been held in some of the states that a city has the power to contract for intrastate rates outside the city. Atlantic Coast Ry. Co. v. Board of Public Utility Com'rs, 89 N. J. Law 407, 99 A. 395; Vining v. Detroit, etc., Ry., 133 Mich. 539, 95 N. W. 542; Georgia Railway & Power Co. v. Decatur, 153 Ga. 329, 111 S. E. 911, for contracts, see Id., 152 Ga. 143, 108 S. E. 615; Selectmen of Westwood v. Dedham, etc., Ry., 209 Mass. 213, 95 N. E. 81; Manitowoc v. Manitowoc & Northern Traction Co., 145 Wis. 13, 129 N. W. 925, 140 Am. St. Rep. 1056; Public Service Commission v. Westchester Street R. R. Co., 206 N. Y. 209, 99 N. E. 536. See, also, Georgia Ry. Co. v. Decatur, 262 U. S. 432, 43 S. Ct. 613, 67 L. Ed. 1065, where the Supreme Court upheld a contract which a Georgia city had made for a rate outside its boundary. We think it can be said on the authority of these cases that a Kentucky municipality, having the right to fix the terms and conditions upon which a street railway shall enter upon and use its streets, may contract with the railway, in consideration for the grant of the use, for a fixed rate for interstate transit beyond the city limits, and that such a contract is valid so long as Congress does not exercise its paramount authority to determine the rates. L. & N. R. R. Co. v. Mottley, supra. There is nothing in R. R. Commission v. Los Angeles R. Co., 280 U. S. 145, 50 S. Ct. 71, 74 L. Ed. 234, which opposes this view. There the contract was held invalid because it was a limitation on the right of the state to exercise its power of regulation by legislation, which power the state had not surrendered. Freeport Water Co. v. Freeport, 180 U. S. 587, 21 S. Ct. 493, 45 L. Ed. 679, construed a state statute granting power to a municipality to contract for rates in the city for a definite period as conferring the right to contract from time to time as might be deemed necessary and not as authorizing

the city to contract once for all. City of Louisville v. Louisville Ry. Co., supra, involved ordinances relating to fares within the city. The case decides nothing more than that a Kentucky city, in passing such ordinances, whether acting under its proprietary powers, as the city there claimed, or under an express delegation from the state, acts in either case under delegated state power, and thus creates federal jurisdiction, under the Fourteenth Amendment, to inquire into the validity of the ordinance. Here the state has no power to regulate interstate rates, and has not undertaken to delegate any such power to the cities. Moreover, the cities have not undertaken to regulate the rates, but have only made agreements as to a matter that is a proper subject for contract. These contracts cannot be objected to on the ground that they are in effect regulations, for, as we have seen, the subject of interstate rates in the absence of congressional legislation is in the domain of contract rights. The assertion of invalidity upon the thesis that the existence of the power to contract is to be denied because of its possible abuse is wholly untenable. The power either exists or does not exist. When it exists and has been exercised, the resulting contract may be defeated for fraud but not for improvidence. Vicksburg v. Vicksburg Waterworks Co., 206 U. S. 496, 515, 27 S. Ct. 762, 51 L. Ed. 1155. So it has been held that a utility company cannot be compelled to serve for less than the contract rates, though they are unreasonably high (Detroit v. Detroit Citizens' Ry. Co., 184 U. S. 368, 389, 22 S. Ct. 410, 46 L. Ed. 592), and similarly, when the contract fixes an inadequate rate, it will be enforced regardless of the operating result (Columbus Ry. Co. v. Columbus, 249 U. S. 399, 39 S. Ct. 349, 63 L. Ed. 669, 6 A. L. R. 1648; Georgia Ry. Co. v. Decatur, supra; St. Cloud Co. v. St. Cloud, 265 U. S. 352, 44 S. Ct. 492, 68 L. Ed. 1050; R. R. Commission v. Los Angeles R. Co., supra).

█ In dealing with the rate contracts claimed by appellants, we consider first the city of Newport, which was incorporated by an act of the Legislature of December 14, 1795. By an amendment to its charter of February 17, 1874,[1] the board of councilmen were given exclusive management and control of all the streets of the city and authorized to prescribe by ordinance the terms and conditions upon which the streets and public ways of the city might be occupied or used. It has been held in Kentucky that this measure of a city's control over its streets authorizes it to fix maximum intracity rates for a

[1] Loc. & Priv. Acts 1873–74, c. 306.

street railway as a condition of the grant to the railway of the right to lay and operate tracks in the city streets. Moberly v. Richmond Telephone Co., 126 Ky. 369, 103 S. W. 714; Campbellsville v. Taylor County Telephone Co., 229 Ky. 843, 18 S.W.(2d) 305. If the city thus has the power to make a contract as to rates in the city, it would obviously have like power in respect to interstate rates, which are not subject to regulation by the state or the city and over which Congress has not exercised its power of control. It was so implied as to the city of Newport in Newport v. Newport & Cincinnati Bridge Co., 90 Ky. 193, 13 S. W. 720, 8 L. R. A. 484.

█ Appellee operates in Newport under grants to its predecessors, the Newport Street Railway Company, the Newport & Dayton Street Railway Company, and the Newport Electric Street Railway Company, made prior to the adoption of the state Constitution of 1891. The first two of these franchises are without limitation as to time. There is no 5-cent fare provision in either. The franchise of the Newport Electric Street Railway Company granted in 1890 provided for a 5-cent fare to Cincinnati, but was limited to twenty-five years and has expired. After acquiring these franchises, the appellee sought to electrify its lines in the city, and in May, 1892, the city council passed an ordinance which authorized appellee to erect and maintain all overhead wires, poles, fixtures, and other appendages necessary to effect the electrification, but which also provided for a 5-cent fare from Newport to Cincinnati. The ordinance was for an indefinite period. Appellee contends, on the authority of South Covington & Cincinnati Ry. Co. v. Henkel & Sullivan, 228 Ky. 271, 14 S.W.(2d) 1068, that this ordinance was invalid. We are not called upon to decide whether the tax provision of the ordinance, admittedly invalid under the state court decision, rendered the entire ordinance invalid; nor need we decide whether it was within the power of the railway company, under the original franchises, to electrify its lines without the consent of the city (Compare: Russell v. Kentucky Utilities Co., 231 Ky. 820, 826, 22 S.W.(2d) 289, 66 A. L. R. 1238; Newport & Dayton Street R. R. Co. v. City of Newport, 1 Ky. Law Rep. 404), or whether the granting of such consent, with authority to erect and maintain the necessary overhead wires, fixtures, etc., was the grant of a new franchise, for section 164 of the Constitution of 1891 provides that no municipality "shall be authorized or permitted

to grant any franchise or privilege, or make any contract in reference thereto, for a term exceeding twenty years," and, whether the ordinance here in question be regarded as the grant of a franchise or merely as a contract relating to an existing franchise, in either view it expired within twenty years from its enactment. Although there is a difference in the requirements of the Constitution as to the manner of granting a new franchise and contracting with reference to an existing one (Woodall v. South Cov. & Cin. St. Ry. Co., 137 Ky. 512, 124 S. W. 843), the Kentucky courts hold that there is no distinction between the two as to the limitation of twenty years (Johnson County Gas Co. v. Stafford, 198 Ky. 208, 214, 248 S. W. 515; Russell v. Kentucky Utilities Co., 231 Ky. 820, 824, 22 S.W.(2d) 289, 66 A. L. R. 1238).

On September 18, 1868, and July 19, 1887, the city of Dayton granted to the Newport & Dayton Street Railway Company perpetual franchises to operate a street railway in the streets of the city. These franchises contained no fare provision. In August, 1887, the grantee conveyed all of its property to the South Covington & Cincinnati Street Railway Company. Subsequent to the present Constitution, on July 5, 1893, the city by ordinance authorized the latter company to substitute electricity for animal power in the operation of its cars. The ordinance contained a 5-cent fare provision from Dayton to Cincinnati. By virtue of section 164 of the state Constitution, this ordinance, like the electrifying ordinance of the city of Newport, was effective only for twenty years from the date of its passage, with the result that all rights acquired thereunder ceased to exist at the end of that period.

On October 26, 1893, a franchise was granted by the city of Ludlow to one of appellee's predecessors. The grant was on condition that the company charge 5 cents for a single fare from Ludlow to Cincinnati. As this grant was made after the adoption of the Constitution of 1891, the rights acquired thereunder expired in twenty years, with the result that Ludlow cannot now claim any benefits under the rate provision therein. On March 4, 1915, however, Ludlow passed an ordinance directing the sale of a franchise for a double track line over certain streets of the city. This franchise was purchased by the South Covington & Cincinnati Street Railway Company March 18, 1915, and certain streets of the city were occupied and used by the railway company thereunder. The ordinance contained a provision for a 5-cent fare from Ludlow to Cincinnati. The franchise is limited to twenty years. The fare provision will accordingly remain in effect only until the date of the expiration of the franchise, March 18, 1935, but for that period is a valid provision.

The record does not show that Bellevue ever made any fare contract with the appellee prior to 1891. The appellee's lines were laid through what is now Bellevue before that city was incorporated and hence without authority of franchise. After the adoption of the Constitution of 1891, an electrification ordinance was passed which provided for a 5-cent fare, but that contract is governed by the provisions of the Constitution and expired with the ordinance into which it was written.

The appellee operates in Covington under various franchises. It was held in Covington v. South Covington St. Ry. Co., 246 U. S. 413, 38 S. Ct. 376, 62 L. Ed. 802, 2 A. L. R. 1099, that the franchises involved in that suit were perpetual. No claim is or can be made by the city to any contract right to an interstate 5-cent fare arising under these franchises. There are fare provisions in the franchise of the Cincinnati, Covington & Rosedale Railway Company of October 20, 1890, and the franchise granted to the South Covington and Cincinnati Street Railway Company by West Covington March 17, 1914. The Cincinnati, Covington & Rosedale Railway Company was incorporated May 22, 1890. The incorporating act provided that the company should not use or occupy any streets, alleys, or highways of the city of Covington, except by and with the consent of the council of the city to be first obtained according to ordinance or resolution which the council might enact or pass for that purpose. On October 20, 1890, the city council enacted an ordinance (amended May 18, 1891) granting the railway company the right to construct and maintain its tracks on certain streets of the city, but provided therein that the company should never charge or receive more than a 5-cent cash fare for a single passage over its line of railway from the southern terminus of its road to its northern terminus in the city of Cincinnati. The grant was for a period of fifty years. The fare provision is said to be invalid because there was no consideration for it, in that the right to use the streets was granted by the state and not by the city, and for the further reason that it is inconsistent with the charter of the railway company and also with the provision in the franchise reserving to the city the right to amend the ordinance. We cannot interpret the charter of the railway company

as giving the company any right to use the streets except with the consent of the council of the city to be obtained by ordinance. It states in terms that the company shall not have the right to use or occupy any street of the city except by and with the consent of the city. The city, having the power to withhold its consent to such use, obviously had the power to stipulate terms upon which it would give its consent. Nor was the right given to the railway company in its charter to receive a fair compensation to be fixed by its board of directors such a right as prevented it from entering into a contract with the city for a rate of fare in consideration of the right to use the city streets. Likewise we see no objection to the validity of the contract in that it reserved to the city the right to amend the ordinance. Upon a careful reading of the entire ordinance, we cannot believe that the parties intended by this reservation to give to the city the power to change the fares upon which they had already definitely agreed. Detroit v. Detroit Citizens' St. Ry. Co., 184 U. S. 368, 397, 22 S. Ct. 410, 46 L. Ed. 592. Neither in our opinion did the failure of the railway company to begin construction prior to the adoption of the Constitution or the passing of the extension ordinances subsequent thereto limit the effective life of the fare provision to the constitutional period of twenty years. These additional ordinances seem to us to be ancillary to the original grants. The grants were made before the adoption of the Constitution. They became effective when made, and, as they were for fifty years, the conditions on which they were made must be held to be of like duration. It results that the injunction should not have been granted so far as it relates to the fares of passengers boarding the cars of appellee on the streets for which the Rosedale Railway Company was granted franchises in the ordinances of October 20, 1890, and May 18, 1891.

The ordinance of March 17, 1914, passed by the city of West Covington provided for bids for a franchise over the streets of West Covington for a period of twenty years. The bid of the South Covington and Cincinnati Street Railway Company under this ordinance was accepted. The ordinance provided for a 5-cent fare and no more for transporting passengers from West Covington to the grantee's terminus in Cincinnati. West Covington is now a part of Covington, but we see no reason why the contract which it made with the Street Railway Company is not enforceable for twenty years from its date, March 17, 1914, as to passengers boarding the railway company's cars on the streets covered by this franchise.

For reasons heretofore indicated, it has not been necessary to discuss provisions in the ordinances in evidence relating to contracts for intrastate fares, for, as stated, the injunction is limited to interference with the proposed increase of interstate fares. It results from the foregoing that the order of injunction is affirmed as to Bromley, Park Hills, Fort Mitchell, South Fort Mitchell, Fort Thomas, Clifton, Bellevue, Dayton, Newport, and Southgate, but is modified as to Covington and reversed as to Ludlow.

Judge HICKENLOOPER participated in the conference decision of this case and concurred in this opinion.